STATE of Wisconsin, Plaintiff-Respondent,†

v.

Julie BARTHELS, Defendant-Appellant.

Court of Appeals

*No. 91-1361-CR. Submitted on briefs November 18, 1991.—Decided January 15, 1992.*

(Also reported in 480 N.W.2d 814.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Steven D. Phillips,* assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general and *Thomas J. Balistreri,* assistant attorney general.

Before Nettesheim, P.J., Brown and Anderson, JJ.

NETTESHEIM, P.J. Julie Barthels appeals from a judgment of conviction for sexual assault against a child contrary to sec. 940.225(1)(d), Stats. (1987–88),[1] and an order denying postconviction relief. She raises two issues on appeal. First, she contends that the trial court's granting of the state's mistrial request after the first jury was sworn violated her constitutional protection against double jeopardy. Second, Barthels contends

---

[1]The present equivalent of this offense is now set out at sec. 948.02(1), Stats.

---

that some members of the second jury were exposed to extraneous prejudicial information regarding another pending criminal charge against her involving the same victim as in this case. We agree with Barthels' arguments. We reverse the judgment of conviction. We will recite the relevant facts as we discuss each issue.

## DOUBLE JEOPARDY AND THE MISTRIAL

### 1. Facts

This issue concerns the role of Dr. Basil Jackson as a prosecution witness. On August 7, 1989, Barthels was admitted to St. Francis Hospital in Milwaukee for "chronic severe depressive disease." Dr. Jackson was Barthels' treating psychiatrist during this period of hospitalization. While hospitalized, Barthels revealed to a psychotherapist that she felt guilty about having sexually and physically abused M.A.T., the child victim in this case. Barthels and her husband were the foster parents of M.A.T. when the abuse occurred.

The psychotherapist reported Barthels' admissions to Dr. Jackson, who then confronted Barthels with this information. Barthels admitted the occurrences, and she and Dr. Jackson thereafter regularly discussed the matter. Eventually, the hospital staff prevailed upon Barthels to sign a release form which permitted the hospital to disclose Barthels' admissions to the Department of Health and Social Services. This revelation eventually led to the charges in this case.[2]

By a motion *in limine,* Barthels sought exclusion of her admissions to Dr. Jackson and others as violative of

---

[2] An accompanying charge of endangering M.A.T.'s safety by conduct regardless of life was also filed against Barthels. The trial court ordered this charge to be separately tried.

her physician-patient privilege. Specifically, Barthels contended that her consent for the release of her medical records was not knowingly and voluntarily given in light of her hospitalization and medications. The state saw Dr. Jackson as an important witness on this question and the state subpoenaed Dr. Jackson to the trial.[3]

On July 9, 1990, two days before the jury trial commenced, the trial court addressed a number of pretrial motions from both the state and the defense. However, the court did not fully resolve all of these at this hearing and, at the conclusion of the hearing, the court indicated that it would revisit the unresolved matters at the commencement of the trial, two days later.[4]

Dr. Jackson arrived at the courthouse on the day of trial at 7:00 a.m. The trial court and the parties first resolved the remaining pretrial issues. A jury was then selected and was sworn in at 10:40 a.m. Without any further proceedings, the jury was then excused for lunch. Apparently Dr. Jackson and the prosecutor had no direct communication during this morning. Per his earlier statement that he could not remain beyond 10:30 a.m., Dr. Jackson left the trial.

Upon the jury's return after lunch, the assistant district attorney reported to the trial court that Dr. Jackson had departed "to leave for out of state." The state expressed its belief that "without Dr. Jackson we

---

[3]Although it is not controlling on the question, we note that the use of a subpoena, however, was at Dr. Jackson's request because his testimony implicated Barthels' physician-patient privilege.

[4]In the course of these proceedings, the state observed in a collateral remark that Dr. Jackson "will be going to Tennessee immediately after his testimony." The remark, however, suggested no problem with Dr. Jackson's ability to attend or remain at the trial.

cannot sustain a conviction." The state requested a mistrial or a continuance. Barthels responded that she preferred a dismissal with prejudice. The trial court denied Barthels' motion for dismissal and granted the state's motion for a mistrial, noting that "the State had made its attempt to have the witness present." Accordingly, the trial court discharged the jury and adjourned the trial to October 2, 1990.

Prior to the adjourned trial date, Barthels sought dismissal of the information on double jeopardy grounds. Dr. Jackson testified at this hearing. He stated that on the day of the original trial, he was scheduled to take a noon plane out of Milwaukee to travel to Tennessee where he had committed to teach a graduate school seminar. Dr. Jackson stated that some weeks before the trial date he had advised the assistant district attorney of this conflict and that he had to leave the trial no later than 10:30 a.m. Dr. Jackson testified that the assistant district attorney advised that "he would see what he could do as early as possible." Dr. Jackson also testified that the assistant district attorney told him that "he would do his best to get me out of there at 10:30 which he knew was the latest time that I could catch my plane." At another point, Dr. Jackson testified that the assistant district attorney "indicated that in his judgment, he didn't give me a guarantee, in his judgment that I would be finished by 10 o'clock because he planned to call me first."

In a written decision, the trial court denied Barthels' motion for dismissal. The court concluded that "the State had taken all steps necessary to assure the presence of the witness and he still did not appear." The court also concluded that Dr. Jackson was an indispensable witness. Finally, the court concluded that "[t]o dismiss this action because of the doctor's failure to appear,

without the complicity of the State, would clearly defeat the ends of justice."

## 2. Analysis

### a. Attachment of Jeopardy

Although the matter is not in dispute, we elaborate somewhat on the fact and significance that jeopardy attached to Barthels when the jury was sworn. Section 972.07(2), Stats.; *Crist v. Bretz,* 437 U.S. 28, 37 (1978); *State v. Fosse,* 144 Wis. 2d 700, 704, 424 N.W.2d 725, 727 (Ct. App. 1988). A defendant has a valuable and protected interest in concluding his or her trial before the first tribunal selected to determine a verdict. *Arizona v. Washington,* 434 U.S. 497, 503 (1978); *State v. Copening,* 100 Wis. 2d 700, 710, 303 N.W.2d 821, 827 (1981). The United States Supreme Court has addressed the policy underlying this constitutional principle:

> [T]he State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him [or her] to embarrassment, expenses and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187–88 (1957). Therefore, Barthels' constitutional protection against double jeopardy was implicated by the trial court's ruling discharging the sworn jury and permitting the state to try Barthels before a second jury.

### b. Sufficiency of Barthels' Objection

The state contends that Barthels did not sufficiently or properly object to the state's request for a mistrial or continuance. We disagree.

When the state asked for a mistrial or continuance, Barthels' counsel responded that he was "responding off the cuff to a motion that I had not had any time to look at." Regardless, counsel expressed his wish to have the matter dismissed with prejudice.

The state contends that Barthels' request for dismissal with prejudice was not sufficient to constitute an objection to the state's request for a mistrial or continuance. An objection must be made with specificity so the trial court and the adversary are given an opportunity to remedy any defect. *See Champlain v. State,* 53 Wis. 2d 751, 758, 193 N.W.2d 868, 873 (1972). Stated differently, a party must register an objection with sufficient prominence such that the court understands what it is asked to rule upon. *See State v. Salter,* 118 Wis. 2d 67, 79, 346 N.W.2d 318, 324 (Ct. App. 1984). However, where the grounds for objection are obvious, as they are here, the specific ground of objection is not important. *Champlain,* 53 Wis. 2d at 758, 193 N.W.2d at 873.

Under the facts of this case, we conclude that the state's argument places form over substance. It was apparent that the state believed that it could not prove its case without Dr. Jackson's testimony. Thus, since the state could not prove its case, Barthels asked for the very relief she would have requested had the matter proceeded without Dr. Jackson's testimony—dismissal with prejudice. This request, we conclude, was equivalent to a request that the matter proceed before the jury which

had been selected and sworn with the same expected result.

Moreover, the record does not even remotely suggest that the trial court or the state saw Barthels as stipulating or acquiescing to a mistrial or a continuance. A fair reading of the record reveals that Barthels wanted dismissal, not a mistrial or continuance. The context of the court's remarks when making its ruling reveals that it saw the state's request for a mistrial or continuance as a matter in dispute. We conclude that Barthels sufficiently preserved her double jeopardy claim.

### c. Standard of Review for Mistrial

A trial court's declaration of a mistrial is addressed to the court's discretion. *Copening,* 100 Wis. 2d at 710, 303 N.W.2d at 826. On appeal, we ordinarily give such a ruling considerable deference. *Id.* at 709, 303 N.W.2d at 826. However, where the mistrial motion is made because the prosecution is unprepared for trial, appellate review becomes markedly stricter. *Id.* at 711, 303 N.W.2d at 827.

### d. Test for Mistrial: Manifest Necessity

The double jeopardy prohibition does not preclude a trial court from terminating a trial without the defendant's consent if it finds a "manifest necessity" for doing so, else "the ends of public justice would otherwise be defeated." *Fosse,* 144 Wis. 2d at 704, 424 N.W.2d at 727–28. Thus, in some cases, "the valued right of a defendant to have his [or her] trial completed by the particular tribunal summoned to sit in judgment on him [or her] may be subordinated to the public interest—when there is an imperious necessity to do so."

885

*Downum v. United States,* 372 U.S. 734, 736 (1963). We now address this question.

### e. Manifest Necessity in This Case

### (1) Dr. Jackson as an Indispensable Witness

Since the declaration of a mistrial rests upon manifest necessity, such a declaration cannot be premised upon the absence of insignificant or merely cumulative evidence. The parties dispute whether Dr. Jackson was a necessary and vital witness to the state in this case. The trial court determined that he was. We agree.

Barthels argues that the substance of her admissions to Dr. Jackson were provable by other witnesses. While true, Barthels overlooks one of her theories of defense—that her admissions were merely fabricated to obtain sympathy. Since the first of these admissions was made to the psychotherapist and then to Dr. Jackson, the circumstances surrounding the genesis for these admissions became important. Dr. Jackson was an important witness on this question.

Barthels also glosses over another of her theories of defense—that her waiver of the physician-patient privilege was unknowing and involuntary because of the medications she was taking. This matter was put in issue by Barthels' motion *in limine* which contended that her statements were obtained in violation of the physician-patient privilege. On this question, Dr. Jackson, as Barthels' attending psychiatrist, had (and ultimately gave) relevant and important testimony.

We affirm the trial court's ruling that Dr. Jackson was an indispensable witness to the state's case.

886

## (2) Manifest Necessity

We now turn to the question of whether manifest necessity existed in this case. The closest case on its facts to the instant case is *Downum*. There, the prosecutor had delivered a subpoena to a marshall for service. However, the marshall did not accomplish service of the subpoena on the witness. The witness' wife advised the prosecutor that she would let the prosecutor know if she heard from her husband. Without any further contact from the witness' wife, the prosecutor allowed a jury to be selected and sworn. The trial court granted a mistrial and a second jury convicted Downum. *Downum,* 372 U.S. at 735.

Concluding that Downum's constitutional right against double jeopardy was violated, the United States Supreme Court held:

> The fact is that, when the district attorney impaneled the jury without first ascertaining whether or not his witnesses were present, he took a chance . . .. The situation presented is simply one where the district attorney entered upon the trial of the case without sufficient evidence to convict.

*Id.* at 737.

Here, of course, the case is stronger for the state since it had subpoenaed Dr. Jackson.[5] The trial court relied on this factor in distinguishing *Downum*. At first blush, this distinction has some appeal. However, upon closer scrutiny of the facts, we conclude that *Downum* nonetheless controls.

Dr. Jackson's testimony regarding his departure from the trial stands unrefuted. He told the prosecutor

---

[5]The decision to subpoena Dr. Jackson, however, was at his request—not the state's. *See supra* note 3.

well in advance of the trial that he had to leave the trial no later than 10:30 a.m. The prosecutor gave Dr. Jackson assurances that he would see to the problem and that, by calling him as the first witness, Dr. Jackson would finish his testimony by 10:00 a.m. The prosecutor, however, did not take any steps to address this potential problem. Standing alone, this inaction is perhaps understandable, since when he made these assurances, the prosecutor may have believed that he could comply with Dr. Jackson's deadline.

However, the situation markedly changed and Dr. Jackson's dilemma significantly heightened as the trial date neared. The trial court did not rule with finality on many of the pretrial motions addressed at the July 9 hearing. Instead, the court advised the parties that it would revisit these matters with counsel on the morning of trial, two days later. The prosecutor did nothing to alert Barthels or the trial court to Dr. Jackson's deadline.

The trial court convened on the morning of trial at 8:30 a.m. The parties and the court then addressed the many pretrial issues still unresolved.[6] Jury selection did not begin until 9:52 a.m. The jury was sworn at 10:40 a.m. Without further proceedings, the jury was then sent to lunch at 11:13 a.m. The parties had yet to deliver their opening statements. Still, the prosecutor remained silent.

We fail to understand how the state could reasonably and in good conscience believe that it could keep its

---

[6]The pretrial issues addressed before jury selection included the admissibility of the Barthels' foster parent records, the dates of M.A.T.'s placement with the Barthels family, the admissibility of the testimony of another alleged victim, whether Barthels' statements to certain therapists were privileged, whether this privilege was waived, and the parties' witness lists.

commitment to Dr. Jackson, knowing the substantial number of issues and the time-consuming procedures which had to be addressed and completed before Dr. Jackson could testify.

The state argues that it did all it could by subpoenaing Dr. Jackson to the trial. The problem, however, was not getting Dr. Jackson to the trial; the problem was assuring that he would remain. Dr. Jackson had told the prosecutor that he could not remain beyond 10:30 a.m. and the prosecutor had assured him that he would finish his testimony by 10:00 a.m. The state never did anything to disabuse Dr. Jackson of these assurances, even as they became increasingly unrealistic in light of the numerous issues yet to be addressed and the procedures yet to be conducted before Dr. Jackson could testify.

The state also contends that its only other alternative to the subpoena was to have Dr. Jackson arrested and post bail pursuant to sec. 969.01(3), Stats. The state is wrong. The state could have asked the trial court to adjourn the proceedings *before* the jury was selected or sworn. The state's actions here were conducted either in ignorance of, or with reckless disregard for, Barthels' constitutional right to have the question of her guilt or innocence concluded before the first tribunal selected for this task. We conclude that the state may not so blithely wash its hands with Dr. Jackson's subpoena.

We also observe that the law requires the trial court to consider other alternatives to a mistrial declaration when the court considers the matter *sua sponte* or on the motion of the prosecutor. *Copening,* 100 Wis. 2d at 711, 303 N.W.2d at 827. Here the state requested a mistrial or a continuance after the jury was sworn. However, the court's remarks reveal no consideration of the possible

alternative of a continuance.[7]

As in *Downum*, the prosecutor here entered upon jury selection and proceeded to the swearing of the jury in the face of a known risk that a critical witness might not be present when called upon to give his testimony. Balanced against Barthels' constitutional, valued and protected interest to conclude her trial before the initial jury selected for this task, we conclude that the state's shared involvement in creating this dilemma precludes a finding of manifest necessity. We reverse the judgment of conviction.

## EXTRANEOUS JUROR INFORMATION

We also address Barthels' second issue.[8] She claims that prejudicial extraneous newspaper information regarding her other pending criminal charge, also involving M.A.T. as the victim, came into the hands and knowledge of certain jurors during the trial.

Barthels was originally charged not only with sexual assault but also with endangering M.A.T.'s safety. This latter charge was based upon an allegation that Barthels had held M.A.T.'s head under water while giving her baths. The trial court ruled that these two offenses were misjoined pursuant to sec. 971.12(1), Stats. Accordingly,

---

[7]We acknowledge that a continuance when a jury is already impaneled may not, in most cases, be a practical alternative. However, the importance of the defendant's constitutional right to have the trial conducted before the jury already sworn makes it necessary for the trial court to at least address this alternative.

[8]Since we have already concluded that Barthels' double jeopardy rights were violated by the mistrial declaration, it is not essential that we address this further issue. We nonetheless choose to do so in the interests of providing the parties a full decision on all of Barthels' claims.

the court ordered the two charges tried separately. *See* sec. 971.12(3). The instant charge, sexual assault, was tried first.

After Barthels was convicted in this case, a police detective reported to the prosecutor that she had spoken with the jury foreman several months after the trial. The jury foreman told the detective that a juror had mentioned to him that she had read a newspaper article during the trial stating that Barthels had been charged with another crime. The prosecutor apparently forwarded this information on to Barthels' attorney, and the trial court conducted an evidentiary hearing on the matter at which all the jurors were questioned.

At the hearing, juror Donald Goetsch admitted that on the night before the trial ended he read an article in the October 3, 1990 edition of the *Sheboygan Press* concerning the Barthels trial. The final paragraph of the article stated:

> Barthels has pleaded not guilty to a charge of endangering safety for allegedly holding the child's head under water several times. The charge will be tried separately from the sexual assault charge.

Juror Goetsch also testified that a female juror stated that she too had read the article. However, at the hearing, none of the female jurors admitted to having read the article.

Based upon this information, Barthels sought a new trial. The trial court denied this request. The court acknowledged that at least one juror and possibly another had been exposed to this extraneous information. The court acknowledged that the information resulted in "some prejudice." However, the court concluded that there was no "reasonable possibility that the extraneous information prejudiced the hypothetical

average juror in this case . . .." The court also concluded that "[t]he connection between the two charges is not sufficient."

██

*State v. Poh,* 116 Wis. 2d 510, 343 N.W.2d 108 (1984), sets out a three-prong test when a court considers an attempt to impeach a jury verdict: (1) whether the evidence proffered is competent under sec. 906.06(2), Stats.; (2) whether there was error, that is, whether the evidence shows substantial grounds sufficient to overturn the verdict; and (3) whether the conviction should be overturned because the error was prejudicial. *Id.* at 515-16, 343 N.W.2d at 112. On appeal, the parties debate the first and third *Poh* factors.

### 1. Competency of the Evidence

The state first argues that Barthels improperly sought to impeach the jury verdict pursuant to sec. 906.06(2), Stats., because her evidence did not demonstrate that the *entire* jury was exposed to the extraneous information.[9] The statute reads, in relevant part:

> [A] juror may testify on the question whether extraneous prejudicial information was improperly brought to the *jury's* attention or whether any outside influence was improperly brought to bear upon any *juror.* [Emphasis added.]

---

[9]The state did not raise this argument in the trial court. However, on appeal we may permit a party who seeks to affirm the trial court's ruling to assert an argument not presented in the trial court if further factfinding is not necessary and where a question of law is presented. *See State v. Milashoski,* 159 Wis. 2d 99, 108-09, 464 N.W.2d 21, 25 (Ct. App. 1990), *aff'd,* 163 Wis. 2d 72, 471 N.W.2d 42 (1991).

The state observes that the statute envisions two scenarios by which a verdict may be impeached: (1) where extraneous prejudicial information was improperly brought to the *jury's* attention; and (2) where outside information was improperly brought to bear upon any *juror*. Since Barthels' challenge is premised upon extraneous prejudicial information, the state reasons that the *entire jury* must be exposed to such information before the verdict may be impeached.

Despite the statute's use of the term "jury" in one scenario and the term "juror" in the other, we conclude the state's construction of the statute is unreasonable. Under the state's analysis, if eleven jurors in this case had been exposed to the extraneous prejudicial information, Barthels could not challenge the verdict.

Also, as Barthels points out, if all twelve jurors had read the offending newspaper article, but did not collectively exchange such knowledge, again Barthels could not challenge the verdict. But if one such juror shared the article with the entire jury, the verdict could be impeached. To permit impeachment of the verdict in the latter situation but not the former makes no sense where all twelve jurors are contaminated.

These examples demonstrate that the state's analysis of the statute is unreasonable and borders on the absurd. We are to avoid such interpretations. *See State v. Berndt,* 161 Wis. 2d 116, 123, 467 N.W.2d 205, 207 (Ct. App. 1991). We also may, in appropriate circumstances, construe singular words in a statute to include the plural and *vice versa.* Section 990.001(1), Stats. To avoid an unreasonable construction of the statute, we properly invoke this principle here.

## 2. "Reasonable Possibility"/Harmless Error Test

 We now turn to the other *Poh* factor at issue in this case—whether the conviction should be overturned because the error was prejudicial. *Poh* holds that this factor is governed by the "reasonable possibility" test; that is, whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. *Poh,* 116 Wis. 2d at 529, 343 N.W.2d at 118-19. Stated somewhat differently, the question is "whether the error is harmless by assessing the impact of the erroneously admitted evidence on the minds of an average jury." *Id.* at 529, 343 N.W.2d at 118-19. The burden of proof on this question is the "beyond a reasonable doubt" standard and this burden rests with the state as the beneficiary of the constitutional error. *Id.* at 529, 343 N.W.2d at 118.

The facts of *Poh* are also instructive in this case. There, the defendant was charged with three counts of homicide by the negligent operation of a motor vehicle while under the influence of an intoxicant. During the course of jury deliberations, two jurors commented about the defendant's prior driving accidents and traffic violations—matters not introduced at the trial. *Id.* at 514, 343 N.W.2d at 111-12. The supreme court concluded that the state had failed to demonstrate that the extraneous information was harmless beyond a reasonable doubt. *Id.* at 530, 343 N.W.2d at 119.

When considering the impact of such an error, the supreme court stated that relevant factors include the nature of the extraneous information, the circumstances under which the information was brought to the jury's attention, the nature of the state's case, the defense presented at trial, and the connection between the extraneous information and a material issue in the case. *Id.*

The trial court reasoned that the connection between the two charges was "not sufficient." We disagree. Both offenses involve Barthels' alleged assaultive behavior against M.A.T. and suggest a pattern of such conduct. Indeed, in this case, the connection is stronger than in *Poh* because here the charged offense and the "extraneous" offense involved the same victim.

The state also argues that the affected jurors would divine from the newspaper article that Barthels' defense in the instant case—that she admitted the sexual assault offense to third parties only to gain sympathy and attention—would also apply to the endangering safety charge.[10] Since the jury rejected Barthels' defense, the state contends that the error was not sufficiently prejudicial to Barthels.

We question whether an average juror would make this sophisticated and substantial deductive leap. The newspaper article made no mention of whether Barthels had admitted to the endangering charge nor of her possible theory of defense to that charge. Instead, the article straightforwardly (and prejudicially) informed the jurors that Barthels stood charged with yet another assaultive offense against M.A.T. We conclude that the extraneous information was prejudicial to Barthels' theory of defense in this case. We also conclude that such error was not harmless beyond a reasonable doubt.

## CONCLUSION

We reverse Barthels' conviction as to both appellate issues. The reversal on the double jeopardy grounds

---

[10]The trial court's decision also relied on this analysis.

requires a dismissal of the information with prejudice. Therefore, we do not order a new trial.

*By the Court.*—Judgment and order reversed.