Antonio CASTANEDA, Jr., by his Guardian ad Litem, John H. Correll, Antonio Castaneda, Sr., Sherry Castaneda and State of Wisconsin Department of Health & Social Services, Plaintiffs-Respondents,

v.

Thomas E. PEDERSON, M.D., and St. Paul Fire & Marine Insurance Co., Defendants-Co-Appellants,

WISCONSIN PATIENTS COMPENSATION FUND, Defendant-Appellant.†

Court of Appeals

*No. 92–0149. Submitted on briefs January 6, 1993.—Decided April 27, 1993.*

(Also reported in 500 N.W.2d 703.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *James R. Gutglass* and *Judith P. Sullivan* of *Gutglass, Erickson & Bonville, S.C.*, of Milwaukee.

On behalf of the defendants-co-appellants, the cause was submitted on the briefs of *Samuel J. Leib* and *Gary R. Sneyd* of *Blumenthal, Jacquart, Blumenthal, Leib & Phelps, S.C.*, of Milwaukee.

On behalf of the plaintiffs-respondents, the cause was submitted on the briefs of *J. Michael End* of *Gray & End*, of Milwaukee.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

FINE, J.   This is a medical-malpractice action brought on behalf of Antonio Castaneda, a minor, to recover damages allegedly sustained by him as the result of the claimed negligent failure by Thomas E. Pederson, M.D., an ophthalmologist, to diagnose Antonio's brain tumor, which allegedly caused Antonio's regression from poor sight to total blindness. Antonio's parents also sought compensation for their losses. The jury found Dr. Pederson causally negligent, and awarded to Antonio the following: $750,000 for pain, suffering, and disability; $300,000 for impairment of his earning capacity; $750,000 for the cost of his future care; and $49,787.08 for his past medical and hospital expenses. Additionally, the jury awarded to Antonio's mother, Sherry L. Castaneda, $150,000 as compensation for the loss of Antonio's society and companionship. The jury awarded nothing to Antonio's father, who was separated from Mrs. Castaneda. Dr.

Pederson and his malpractice insurer, St. Paul Fire & Marine Insurance Company, and the Wisconsin Patients Compensation Fund appeal. We affirm, and discuss in turn the issues they raise.

1. *Alleged juror misconduct.*

Both Dr. Pederson and the Wisconsin Patients Compensation Fund assert that the trial court should have granted a new trial because, during a noon break between the closing arguments, one of the jurors researched the range of jury awards in medical malpractice cases. They argue that the jury was tainted or, at the very least, the individual juror should have been disqualified from the case. If the juror was disqualified, a new trial would be necessary because she was one of the ten out of twelve jurors who joined in the verdict. *See* Rule 805.09(2), Stats. (verdict in civil case must be agreed to by five-sixths of the jurors).

In a post-conviction hearing, the trial court found that the juror consulted a 1987 publication that pegged the average medical-malpractice award in 1985 at $1.5 million. The trial court further found that the juror did not share this information with the other jurors until after all but one of the special-verdict questions had been answered. The remaining question asked the jury to fix an award that would fairly and reasonably compensate Antonio for his pain, suffering, and disability. As noted, the jury awarded to Antonio $750,000 in response to this question.

The trial court's findings of fact are not challenged on appeal, and we accept them under our deferential standard of review. *See* 805.17(2), Stats. (trial court's findings of fact may not be reversed on appeal unless they are "clearly erroneous"). The trial court concluded the defendants had not shown by clear and convincing

proof that a new trial was warranted. Although we are assisted by the trial court's thoughtful and able examination of the problem created by the juror's excursion into independent research, we review *de novo* the trial court's ultimate legal conclusion that a new trial was not warranted. *See After Hour Welding v. Laneil Management Co.*, 108 Wis. 2d 734, 741, 324 N.W.2d 686, 690-691 (1982). We agree with the trial court's conclusion, and affirm.

A party seeking to impeach a jury verdict in a civil case with evidence of juror-misconduct must clear three hurdles. First, the proffered evidence must be competent under Rule 906.06(2), Stats. *After Hour Welding*, 108 Wis. 2d at 738-740, 324 N.W.2d at 689-690. Second, the proffered evidence must be "clear and convincing." *Id.*, 108 Wis. 2d at 740-741, 324 N.W.2d at 690. Third, the competent evidence must show by the "clear and convincing" standard that the moving party was prejudiced"not in an analysis of the jurors' subjective thought processes, because that inquiry is forbidden by Rule 906.06(2), but, rather, " 'on the basis of the nature of the matter and its probable effect on a hypothetical average jury.' " *Id.*, 108 Wis. 2d at 741, 324 N.W.2d at 691 (citation omitted).

Rule 906.06(2), Stats., provides that a juror may testify, either in person or by affidavit, "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror." Evidence that a juror was exposed to matters not of record is competent under Rule 906.06(2). *See State v. Poh*, 116 Wis. 2d 510, 520-521, 343 N.W.2d 108, 114 (1984) (defendant's driving

record). The average medical-malpractice award in 1985 was extraneous to the record and, therefore, the evidence concerning the juror's conduct was competent. The first hurdle of the *After Hour Welding* analysis is thus cleared.

The second and third hurdles to jury impeachment in a civil case established by *After Hour Welding* are interrelated: the party seeking a new trial must establish by clear and convincing evidence that a new trial is warranted because of the prejudicial impact the extraneous information would have on a hypothetical average jury, in light of the facts, circumstances, and result of the case.[1] *United States v. Crosby*, 294 F.2d 928, 950 (2d Cir. 1961), *cert. denied*, 368 U.S. 984 (relied upon by *After Hour Welding*, 108 Wis. 2d at 741, 324 N.W.2d at 691); *see Poh*, 116 Wis. 2d at 530, 343 N.W.2d at 119. We look to a "hypothetical jury" because, as noted, inquiry into the motives of the actual jury is expressly forbidden by Rule 906.06(2), Stats. We consider the result because otherwise the question of prejudice becomes a speculative, almost metaphysical exercise.[2]

---

[1] In criminal cases, a finding that the extraneous information would be prejudicial to a hypothetical jury requires reversal unless the error is harmless beyond a reasonable doubt. *State v. Poh*, 116 Wis. 2d 510, 529, 343 N.W.2d 108, 118-119 (1984).

[2] The following two scenarios demonstrate the rationale behind this rule:

1) A man is seriously injured as the result of the defendant's negligence. A fair award for the man's injuries is within the range of fifty to one-hundred thousand dollars. During the course of its deliberations, the jury learns that the man is a paroled murderer. The jury awards the man a total of ten dollars for his injuries.

2) The facts are the same as in 1 but the jury awards the man a total of seventy-five thousand dollars for his injuries.

The Wisconsin Patients Compensation Fund cites cases, including those from other states, where new trials were ordered because of prejudicial extraneous information. The Wisconsin decisions it cites are representative: *Poh*, 116 Wis. 2d 510, 343 N.W.2d 108; *State v. Barthels*, 166 Wis. 2d 876, 480 N.W.2d 814 (Ct. App. 1992), *aff'd on other grounds*, 174 Wis. 2d 173, 495 N.W.2d 341 (1993); and *State v. Ott*, 111 Wis. 2d 691, 331 N.W.2d 629 (Ct. App. 1983).

In *Poh*, the defendant was convicted of three counts of negligent operation of a motor vehicle while under the influence of an intoxicant. 116 Wis. 2d at

---

In both instances, the information that the man is a paroled murderer is extraneous and prejudicial. Under the applicable test, the court must evaluate the impact of that extraneous and prejudicial information on a hypothetical average jury. If the actual outcome in each case could not be considered in evaluating whether reversal was warranted, however, reversal would be required either in both or neither of the cases, and would depend solely on an assessment in the abstract of the degree of prejudice. Although the dissent bows to this logic in what it calls "the more obvious cases," Dissent at 481, its resolution to ignore the result in closer cases is contrary to both the teaching of *Crosby*, 294 F.2d 928, 950 (2d Cir. 961), *cert. denied*, 368 U.S. 984, and the factors *Poh* suggests should be considered, 116 Wis. 2d at 530, 343 N.W.2d at 119 ("the nature of the state's case; the defense presented at trial; and the connection between the extraneous information and a material issue in the case"). The dissent's position that the actual result in the case is not material except in the "obvious" cases cuts the required analysis loose from the anchor of reality and permits hypothetical excursions into the seas of speculation where the only polestar is the judge's own subjective views. The law requires standards of review that are more stable; the quest for the great White Whale of perfection must, at some point, end. *See State v. Marhal*, 172 Wis. 2d 491, 495-496 n.3, 493 N.W.2d 758, 761 n.3 (Ct. App. 1992) (no reasonable way to ensure "perfect" jury).

514, 343 N.W.2d at 111. In the course of their deliberations, some of the jurors were told by another juror that the defendant had a history of drunk driving and, indeed, previously had been involved in fatal accidents. *Id.*, 116 Wis. 2d at 520-521, 343 N.W.2d at 114-115. *Poh* recognized that the "other acts evidence" in the case "raise[d] 'a definite risk that the jury might convict to punish a person they perceive to be a generally bad actor where automobiles are concerned.' " *Id.*, 116 Wis. 2d at 531, 343 N.W.2d at 119 (citation omitted, bracketing added). The court noted that, although the evidence in the case was sufficient to convict Poh, there were what the court termed "weaknesses" in the State's case. *Id.*, 116 Wis. 2d at 532, 343 N.W.2d at 120. Given the power of the "other acts evidence" to divert the jury from its impartial assessment of the case, the supreme court directed that a new trial be ordered. *Id.*, 116 Wis. 2d at 532-533, 343 N.W.2d at 120.

*Barthels* and *Ott* present similar situations. In *Barthels*, the defendant was convicted of first-degree sexual assault against a child. 166 Wis. 2d at 879, 480 N.W.2d at 816. During the course of the trial, some jurors were exposed to a newspaper article reporting that the sexual-assault charge had been severed from an endangering-safety charge that involved the same victim. *Id.*, 166 Wis. 2d at 890-891, 480 N.W.2d at 820-821. In an alternate holding, *see id.*, 166 Wis. 2d at 890 n.8, 480 N.W.2d at 820 n.8, *Barthels* noted that the similarity between the two charges improperly suggested "a pattern" of "assaultive behavior" against the alleged victim. *Id.*, 166 Wis. 2d at 895, 480 N.W.2d at 822. Other act evidence may not be used to show a defendant's propensity to commit the crime charged. Rule 904.04, Stats.

In *Ott*, the defendant was convicted of injury by conduct regardless of life. 111 Wis. 2d at 691, 331

N.W.2d at 629. Central to this issue was whether the defendant's conduct under consideration "evinced" a "depraved mind." *Id.*, 111 Wis. 2d at 692, 331 N.W.2d at 630. Following instruction by the trial court, and after the jury had started to deliberate, the jury was permitted to go home for the night. *Ibid.* One of the jurors then looked up the jury definition of the words "evinced" and "depraved." *Id.*, 111 Wis. 2d at 693, 331 N.W.2d at 630. *Ott* determined that the dictionary definition of "depraved," as most likely discovered by the juror (the precise definition was not of record, *id.*, 111 Wis. 2d at 695, 331 N.W.2d at 631), "was sufficiently broader than the technical meaning embodied in the instruction to probably prejudice Ott." *Id.*, 111 Wis. 2d at 696, 331 N.W.2d at 631. A new trial was ordered. *Id.*, 111 Wis. 2d at 696-697, 331 N.W.2d at 632.

The circumstances here are substantially different from any of the authorities cited by the defendants. Although wholly inappropriate, the juror's research on benchmark awards in medical malpractice cases merely extended—by how much is not in the record—the average citizen's awareness of jury verdicts generally, as reported in the lay media. Thus, as *Poh* teaches, the juror's "discovery" was very little different from what jurors are expected to bring with them into the jury room:

> Jurors are expected to bring commonly known facts and their experiences to bear in arriving at their verdict.[3] We cannot "expunge from jury delibera-

---

[3] A footnote in *Poh* at this point reads:

"[I]t is an impossible standard to require the tribunal [the jury] to be a laboratory, completely sterilized and freed from any external factors." *Rideau v. Louisiana*, 373 U.S. 723, 733 (1963) (Clark, J., dissenting).

tions the subjective opinions of jurors, their attitudinal expositions or their philosophies. These involve the very strengths of our jury system."

*Poh*, 116 Wis. 2d at 518-519, 343 N.W.2d at 113 (citation omitted). Additionally, this is not a case where the extraneous information was either at odds with the applicable legal standards, the *Ott* situation, or deemed by the law to be prejudicial *per se*, the *Poh* and *Barthels* situations. As the trial court pointed out, the jury determined that as a result of Dr. Pederson's negligence, Antonio went from poor vision to no vision at all. We conclude, as did the trial court, that an award of $750,000 for Antonio's pain, suffering, and disability is low, and does not demonstrate by clear, satisfactory, and convincing evidence that a hypothetical average jury reaching the same result would have probably been prejudiced against the defendants by the extraneous information.[4] A new trial was not warranted either with respect to the jury as a whole or with respect to the juror who did the over-the-recess research.[5]

*Poh*, 116 Wis. 2d at 518 n.6, 343 N.W.2d at 113 n.6 (bracketing in original).

[4] Unlike the dissent, we do not read the trial court's decision as determining that there was "prejudice" "[w]ithout question." *See* Dissent at 479. At most, the trial court found a wash in prejudicial effect when it concluded that "the award . . . was so low as to make the prejudice . . . equally applicable to the plaintiff and the defendant." *See ibid.* To conclude, as does the dissent, that this finding of "equally applicable" prejudice is equivalent to a finding of "prejudice" "[w]ithout question," is akin to saying that "both teams scored" when a football game ends in a seven-to-seven tie. Simply put, a finding of "equally applicable" prejudice fails the prejudice prong of the test in *After Hours Welding v. Laneil Management*, 108 Wis. 2d 734, 741, 324 N.W.2d 686, 691 (1982).

[5] The Wisconsin Patients Compensation Fund argues in its brief that the brochure examined by the juror during the break

2.  *Evidence to support jury's finding that Dr. Pederson's negligence caused Antonio's injuries.*

The Wisconsin Patients Compensation Fund and Dr. Pederson argue that there was insufficient evidence to support the jury's verdict. Specifically, they argue that much of Antonio's injuries were caused by his fall down some stairs, after he was treated by Dr. Pederson. Additionally, Dr. Pederson contends that two of the Castanedas' expert witnesses, Dr. Marilyn Kay and Dr. Joel Weinstein, lacked the requisite expertise to give an opinion as to the standard of care applicable to the average ophthalmologist. This latter issue bears on the first. Accordingly, we discuss it first.

*A.  Qualifications of Drs. Kay and Weinstein.* The thrust of Dr. Pederson's argument concerning the qualifications of Drs. Kay and Weinstein is that they were *too* qualified. Thus, he argues in his appellate brief:

> Dr. Kay and Dr. Weinstein are neurophthalmologists, not general ophthalmologists. Their expertise is focused on problems the general ophthalmologist cannot handle and their practices are reliant upon referrals from general ophthalmologists and other physicians. They do not practice in the "trenches" of general ophthalmology in the manner in which Dr. Pederson does. Dr. Kay, in particular, only sees patients who have been referred by other ophthalmologists or neurologists or neurosurgeons who feel

in deliberations contained additional extraneous and prejudicial information other than the average medical malpractice award in 1985, and points to the brochure's table of contents. The trial court, however, made no finding as to this other information. Rather, its findings are focussed entirely on the 1985 average. The Fund has not directed us to anything in the record that supports its argument that either the juror, or the jury, was tainted by anything else that might have been in the brochure.

there is a neurologic problem affecting the patient's vision. Her field is restricted to the field of ophthalmology that deals with neurological and brain problems as they affect the eyes and vision of a patient.

This argument borders on the frivolous.

Dr. Kay is a board certified ophthalmologist and specializes in neuro-ophthalmology. She is an associate professor of ophthalmology at the Medical College of Wisconsin, where she was acting chairman of the ophthalmology department. She is also a board examiner in ophthalmology. Additionally, she practiced general ophthalmology when she worked in the City General Ophthalmology Clinic in Houston, Texas. Dr. Kay clearly has the requisite degree of "knowledge, skill, experience, training, or education" to give an opinion as to whether Dr. Pederson fulfilled the applicable standard of care. *See* Rule 907.02, Stats. *Cf. Kerkman v. Hintz*, 138 Wis. 2d 131, 149, 406 N.W.2d 156, 163 (Ct. App. 1987) (medical doctor may give an opinion "as to a chiropractor's performance under the chiropractic standard of care . . . if there is a sufficient factual showing that the medical witness is qualified by 'knowledge, skill, experience, training, or education,' *see* sec. 907.02, Stats."), *aff'd in part and rev'd in part on other grounds*, 142 Wis. 2d 404, 418 N.W.2d 795 (1988). Significantly, neither Dr. Pederson nor the Wisconsin Patients Compensation Fund specifically objected before the trial court to her competency to testify (beyond asserting the non-specific "lack of foundation"), and Dr. Pederson cites no authority in support of his proposition that Dr. Kay was not qualified to give an opinion under Rule 907.02.

■

Although the Castanedas' brief on appeal does not address Dr. Pederson's contention that Dr. Weinstein

was also not qualified to give an expert opinion about the appropriate standard of care, and this would be sufficient grounds for us to reverse on this point, *see Charolais Breeding Ranches, Ltd. v. FPC Securities Corp.*, ?0 Wis. 2d 97, 109, 279 N.W.2d 493, 499 (Ct. App. 1979) (" 'Respondents on appeal cannot complain if propositions of appellants are taken as confessed which they do not undertake to refute.' " (citation omitted)), we conclude upon our independent analysis of the record that, like Dr. Kay, Dr. Weinstein, who is a neuro-ophthalmologist and has practiced pediatric ophthalmology, was qualified under Rule 907.02, Stats., to give the opinion.[6]

*B. Sufficiency of the Evidence.* Both the Fund and Dr. Pederson contend that there was insufficient evidence to support the jury's verdict. Our standard of review of a jury's verdict is, however, severely circumscribed; we must affirm "if there is any credible evidence to support the verdict." *Fehring v. Republic Ins. Co.*, 118 Wis. 2d 299, 305, 347 N.W.2d 595, 598 (1984). Our task is not to search the record for evidence contrary to the jury's verdict, but, rather to search the record for credible evidence in support of the verdict, accepting any reasonable inferences favorable to the verdict that the jury could have drawn from that evidence. *Id.*, 118 Wis. 2d at 305-306, 347 N.W.2d at 598.

---

[6] We note that as with his challenge of Dr. Kay's credentials to give an opinion in this case, Dr. Pederson has not cited authority in support of his proposition that Dr. Weinstein did not meet the requisite qualifications under Rule 907.02, Stats. *See W. H. Pugh Coal Co. v. State*, 157 Wis. 2d 620, 634, 460 N.W.2d 787, 792 (Ct. App. 1990) (an appellate court is not required to determine an issue that is undeveloped in the briefs or that contains no citation to authority); *see also* Rule 809.19(1)(e), Stats.

Dr. Kay testified that in her opinion Dr. Pederson failed to fulfill the applicable standard of care because he failed to take appropriate actions when he discovered the boy's optic atrophy on July 21, 1988. There was also evidence that this failure was a substantial factor in Antonio's blindness, which, in turn, was a substantial factor in his fall down the stairs. Thus, Dr. Kay opined that had Dr. Pederson properly diagnosed Antonio, Antonio's vision would have either improved or Antonio "would have at least retained" the minimal vision he did have. Similarly, Antonio's treating pediatric neurologist testified that Antonio's "vision would probably be better if the tumor was diagnosed earlier." Furthermore, Dr. Glenn Meyer, a professor of neurosurgery and pediatrics at the Medical College of Wisconsin, testified that, "within reasonable medical probability," Antonio's vision "would have been somewhat better" if the tumor operation had been done shortly after Dr. Pederson saw Antonio, in July of 1988. Dr. Meyer also testified that the tumor and its effect on Antonio's vision "certainly led to the fall down the stairs." In light of this evidence and our standard of review, the defendants' contention that there was insufficient evidence to support the jury's finding of causal negligence is without merit.[7] Similarly without

[7] Both the Wisconsin Patients Compensation Fund and Dr. Pederson make passing reference to Antonio's apparent mental retardation, endocrine disorder, and decreased life-expectancy in the course of their argument that the evidence adduced at trial does not support the jury's verdict. Neither party, however, cites to the record, proffers legal authority, or in any other way develops this part of its argument, other than to point out that some of plaintiffs' expert witnesses attributed Antonio's mental retardation to his fall down the stairs. We decline to address this sub-issue except to note, as we have already seen, that

merit is the defendants' contention that this court should order a remittitur; the argument is based on their challenge to the sufficiency of the evidence.

3. *Depositions of Dr. David Allen and Dr. Joel Weinstzein.*

Dr. Pederson claims that the trial court erred in permitting the Castanedas to read to the jury deposition testimony of Drs. Allen and Weinstein even though Drs. Allen and Weinstein were originally identified as defense witnesses. Dr. Pederson also claims error because the trial court permitted the Castanedas to tell the jury that Drs. Allen and Weinstein had originally been identified as defense witnesses. Finally, Dr. Pederson contends that the opinions offered by Drs. Allen and Weinstein failed to meet the requisite legal standard. We discuss these issues in turn.

▮

First, we perceive no legal reason why the deposition testimony by Drs. Allen and Weinstein should not have been read to the jury, and, beyond their mere contention to the contrary, defendants assert none. *See* Rule 804.07(1)(c), Stats. ("The deposition of a medical expert may be used *by any party for any purpose*, without regard to the limitations otherwise imposed by this paragraph." (emphasis added)).

▮

Second, other than the inapposite citation to *State v. Tilley*, 79 S.E.2d 473 (N.C. 1954), which opined, in *dictum*, that a party may not impeach the testimony of the witness whose deposition that party offers, *see id.*, 79 S.E.2d at 475, an outmoded view that is contrary to

---

there is sufficient competent evidence in the record that Dr. Pederson's negligence was a substantial factor in Antonio's fall. *See W. H. Pugh Coal Co.*, 157 Wis. 2d at 630, 460 N.W.2d at 792; Rule 809.19(1)(e), Stats.

Rule 906.07, Stats., Dr. Pederson has cited no authority to support his argument that the trial court erred when it permitted the plaintiffs to tell the jury that Drs. Allen and Weinstein had been designated as defense witnesses.[8] We perceive no error, and, in light of Dr. Pederson's failure to develop his argument, we do not consider it further. *See W. H. Pugh Coal Co.*, 157 Wis. 2d at 634, 460 N.W.2d at 792; Rule 809.19(1)(e), Stats.

Dr. Pederson's complaint that the opinions of Drs. Allen and Weinstein were not given to the requisite degree of professional probability is also without merit. First, an expert witness need not use any specific language in giving an opinion, as long as his or her testimony is not speculative. *Drexler v. All American Life & Casualty Co.*, 72 Wis. 2d 420, 432-433, 241 N.W.2d 401, 408 (1976). The opinions given by Drs. Allen and Weinstein during the course of their testimony were not speculative. Second, had the defendants wanted Drs. Allen and Weinstein to base their opinions in more specific language, they were obligated to object during the deposition. *See* Rule 804.07(3)(c)1 & 2, Stats.[9] Challenges to any infirmity in the degree of

---

[8] Rule 906.07, Stats., provides:

**Who may impeach.** The credibility of a witness may be attacked by any party, including the party calling the witness.

[9] Rule 804.07(3)(c)1 & 2, Stats., provides:

*As to taking of deposition.* 1. Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time.

2. Errors and irregularities occurring at the oral examination in the manner of taking the deposition, in the form of the

474

certainty of their opinions, and we perceive none, were thus waived. *See ibid.*

4. *Alleged contributory negligence of Antonio's mother.*

The defendants contend that Antonio's mother was contributorily negligent in both failing to bring Antonio back to Dr. Pederson for a follow-up visit, and because she allegedly failed to take reasonable precautions to prevent him from falling down the stairs. They argue that the trial court erred in not submitting the issue of the mother's contributory negligence to the jury. We do not reach the merits of this contention because the defendants did not preserve this issue for appeal.

Rule 805.13(3), Stats., provides that failure of counsel to object at the instructions conference, which must be held prior to closing arguments, to the trial court's proposed jury instructions "constitutes a waiver of any error in the proposed instructions or verdict." Although counsel for Dr. Pederson did submit to the trial court proposed instructions concerning the Castanedas' alleged contributory negligence, there was no objection to the trial court's decision not to include the contributory-negligence issue in the instructions until after closing arguments were completed. Indeed, before the lawyers began their closing arguments, the trial court specifically, and appropriately, attempted to determine whether any counsel had objections to the proposed instructions: "I understand there's been a stipulation on all the instructions, that the only issue is the one question on the special verdict, which I think is

---

questions or answers, in the oath or affirmation, or in the conduct or parties, and errors of any kind which might be obviated, removed, or cured if promptly presented, are waived unless seasonable objection thereto is made at the taking of the deposition.

cured by the instruction, and therefore we're ready to proceed with closing arguments." Neither counsel for the Wisconsin Patients Compensation Fund nor counsel for Dr. Pederson raised any objection at that time to the trial court's having not included the issue of whether Antonio's mother was contributorily negligent. The issue was waived.

5. *Request by the Wisconsin Patients Compensation Fund to amend scheduling order.*

The Wisconsin Patients Compensation Fund contends that a new trial is required because the trial court declined to amend a previously-entered scheduling order so as to permit the belated naming of certain defense witnesses.

This action was commenced on March 27, 1989. Trial was scheduled to begin on February 4, 1991. On January 23, 1991, less than two weeks prior to trial, the Fund appeared by new counsel. The trial court denied the Fund's motion to delay the trial. This court granted a stay pending the Fund's interlocutory appeal. The interlocutory appeal was voluntarily dismissed on February 19, 1991, after the February 4 trial date had passed. The Fund then sought to amend the scheduling order to permit the naming of additional witnesses who were expert "in various specialties including pediatric neurology, neuropathology, diabetes and endocrinology, neurosurgery and ophthalmology." The trial court denied the motion, and the Fund unsuccessfully sought leave to appeal to this court.

The Fund sought reconsideration of the trial court's earlier denial of the Fund's motion to name additional expert witnesses. The motion specifically referred to witnesses previously identified by the Fund in a letter dated February 21, 1991. The trial court

granted this motion in full. The Fund's claim that the trial court also denied the Fund's motion to name additional witnesses—witnesses not named in the February 21 letter—is not supported by the record.

For the foregoing reasons, we affirm the judgment entered upon the verdict.

*By the Court.*—Judgment affirmed.

SCHUDSON, J. (*dissenting*). As the majority explains, under *After Hour Welding v. Laneil Management Co.*, 108 Wis. 2d 734, 324 N.W.2d 686 (1982), we must review the trial court's determination of whether the appellants offered clear and convincing evidence of prejudice " 'on the basis of the nature of the matter and its probable effect on a hypothetical average jury.' " See majority op. at 463. I conclude that appellants did so and, therefore, the trial court erred in denying the motion for mistrial.

## I.  Background

The majority acknowledges that "the juror's research on benchmark awards in medical malpractice cases" was "wholly inappropriate." Id. at 467. The question, then, is whether the jury's or juror's exposure to that information, during deliberations, probably produced prejudice. That, under *After Hour Welding*, must be measured by (1) "the nature of the matter," and (2) "its probable effect on a hypothetical average jury." *After Hour Welding*, 108 Wis. 2d at 741, 324 N.W.2d at 691.

To gain perspective on "the nature of the matter," it may be helpful to step back, broaden our view, and observe the following. First, if any party would have moved to introduce evidence of "research on benchmark awards in medical malpractice cases," or the

1985 "range of jury awards in medical malpractice cases," see majority op. at 462 & 467, the trial court certainly would have excluded such information. Second, if any party would have included that information in closing argument, the trial court, at the very least, would have ordered the jury to disregard the comments.

The reason, I think, is obvious. The very "nature of the matter" — "benchmark awards" and "range of jury awards" — clearly related to the trial subject of damages. While related to that *subject*, however, the information was irrelevant to the trial *issue*: what award *in this case* would fairly and reasonably compensate for pain, suffering, and disability. Accordingly, given "the nature of the matter," the trial court was correct in concluding, "There's no doubt that the material was extraneous and that it was improperly brought to the jury's attention."

Next, then, we must consider the "probable effect" of that extraneous material "on a hypothetical jury." Certainly, the trial court would have excluded such inadmissible information and, had the information been argued, the trial court would have issued a strong, cautionary instruction. The reason, again, is obvious. The information matters. It is not some innocuous detail that would probably pass without notice. Because of their close relationship to the issue of damages, the "benchmark awards" and "range of jury awards" probably would have distracted a jury and influenced its decision.

Here, of course, we have a different situation. This difference, however, is one that places the integrity of a verdict at far greater risk. While the two examples — attempted introduction of evidence, and closing argument — would have allowed for trial court correction, here the juror's "wholly inappropriate" conduct

brought the improper information to the jury's deliberations. The trial court could not do anything to exclude or reduce the impact of the extraneous material. Now, with that in mind, let us consider the trial court's and the majority's conclusions.

## II.   All Twelve Jurors and the Last Verdict

Denying the defendants' motion for a new trial, the trial court stated:

> Indeed, it is difficult to determine whether the improper materials obtained by one and later supplied to other jurors was not in fact more prejudicial to the plaintiff than to the defendant....
>
>   . . . .
>   . . . [T]he award . . . was so low as to make the prejudice as to the amount of damages found by the jury in answer to question 3(a) equally applicable to the plaintiff and the defendant.

Without question, then, the trial court found prejudice. The trial court considered whether the plaintiffs or defendants suffered more from the prejudice, and concluded that the prejudice was "difficult to determine" and yet, "equally applicable" to both parties.

The majority assumes that our *de novo* review, like the trial court's determination, necessarily derives from an analysis of the direction and amount of prejudice; in other words, that the defendants would have had to have suffered, and suffered more than the plaintiffs in order to gain a new trial. The authorities, however, convince me that this is not so.

In *After Hour Welding*, the supreme court rejected such analysis in favor of a less speculative assessment. Delineating the proper method to evaluate "prejudicial effect," the court explained:

Although the court stated in *Shefelker v. First National Bank*, 212 Wis. 659, 666, 250 N.W. 870, 872 (1933) and *State v. Hartmann*, 46 Wis. 248, 249, 50 N.W. 193, 194 (1879), that the trial court must determine whether the misconduct had or might have had an unfavorable effect upon the verdict against the moving party moving for a new trial, that statement was made in explanation of a more restrictive common law rule in effect before sec. 906.06(2) was adopted. We find the more appropriate determination whether prejudice resulted is "on the basis of the nature of the matter and its probable effect on a hypothetical average jury." *United States v. Crosby*, 294 F.2d 928, 950 (2nd Cir. 1961).

*After Hour Welding*, 108 Wis. 2d at 741, 324 N.W.2d at 691.

Accordingly, the court in *After Hour Welding* remanded the case specifically to determine "not as to what effect" the improper information had on the jurors, but rather, "the probable effect . . . upon a hypothetical average jury." *Id.*

Thus, in this case, if the extraneous material was prejudicial, and if the direction and relative amount of prejudice was, as the trial court concluded, "difficult to determine" or "equally applicable" to both sides, the prejudice, under *After Hour Welding*, is "clear and convincing." See *id.*, 108 Wis. 2d at 740-741, 324 N.W.2d at 690. After all, the defendants were one of the two sides prejudiced " 'on the basis of the nature of the matter and its probable effect on a hypothetical average jury.' " *Id.* An attempt to assess whether that prejudice "might have had an unfavorable effect upon the verdict against the moving party," see *id.*, 108 Wis. 2d at 741, 324 N.W.2d at 691, enters the speculative region that, *After Hour Welding* explained, is off limits.

480

Although I respect the majority's carefully reasoned explanation of why "the actual outcome in each case" could be considered in evaluating the impact of prejudicial information on a hypothetical average jury, I am not convinced that such consideration is useful or conclusive in any but the more obvious cases, such as those utilized in the majority's examples, see majority op. at 464 n.2. In less obvious cases, speculative conclusions about the direction and relative amount of prejudice are of no legal significance. This became even more clear when, two years after deciding *After Hour Welding*, the supreme court decided *State v. Poh*, 116 Wis. 2d 510, 343 N.W.2d 108 (1984). There, the supreme court further explained:

> In other words, the circuit court must determine whether it is convinced by clear and satisfactory evidence that the alleged extraneous information reached the jury and *could* bias the jury against the moving party.

*Poh*, 116 Wis. 2d at 523, 343 N.W.2d at 115 (emphasis added).

I recognize that *Poh*'s elaboration comes in the context of a criminal case. I also recognize, therefore, that the *possibility* of prejudice in a criminal case under *Poh*, and the *probability* of prejudice in a civil case under *After Hour Welding*, present distinguishing standards. In this case, however, the distinction produces no difference. In this case, of course, the "extraneous information" about the average range of jury awards "reached the jury" and "could bias" the jury against the defendant. Moreover, in this case, as the trial court concluded, the information *did* bias the jury against the defendant. That the bias also may have been "equally applicable" to the plaintiff is hardly

reassuring and, under *After Hour Welding* and *Poh*, of no legal consequence.

The majority's analysis quickly reveals the inherent difficulty encountered when moving from the mission of *After Hour Welding* and *Poh* to an adventure in speculation. In its effort to support its conclusion, the majority necessarily attempts to assess the improperly introduced information in a way that would remove any probable prejudice *against* the defendants. The attempt, however, fails:

> Although wholly inappropriate, the juror's research on benchmark awards in medical malpractice cases merely extended—by how much is not in the record—the average citizen's awareness of jury verdicts generally, as reported in the lay media. Thus, as *Poh* teaches, the juror's "discovery" was very little different from what jurors are expected to bring with them into the jury room.

Majority op. at 467.

Although I, like the majority, can point to no authority, I believe that any poll, scientific or otherwise, would disclose that "the average citizen's awareness of jury verdicts generally" ranges somewhere between, "Beats me!" and "How should I know?". The majority's claim that a "publication that pegged the average medical-malpractice award in 1985 at $1.5 million," see majority op. at 462, was "very little different from what jurors are expected to bring with them into the jury room," see *id.* at 467, is unsupported and unrealistic. While bringing intelligence, experience, and common sense to their jury work, our average citizens bring almost no "awareness of jury verdicts generally."

482

Further, "merely extend[ing]" the "awareness" of jurors is likely to be fatal to the integrity of a verdict when it comes not through evidence that can be challenged or stricken, not through argument that can be answered or instructed away, but through the introduction of *inadmissible, prejudicial* information through juror misconduct. As the supreme court emphatically declared: "The common knowledge jurors are allowed and encouraged to bring to their deliberations does not include prejudicial information." *After Hour Welding*, 108 Wis. 2d at 744, 324 N.W.2d at 692.

### III.  The Offending Juror and All Verdicts

The majority barely addresses appellants' additional argument that even if the prejudicial impact on the other jurors remains uncertain or even accrues to the benefit of the defendants, the offending juror's conduct, if known, would have led to her disqualification. The respondents, and the majority, respond only by maintaining that if the information was more prejudicial to the plaintiffs, the offending juror was no more contaminated than the other eleven. Even if I shared that view regarding the impact of the extraneous material on the other eleven jurors and the last verdict question, I find nothing in the majority opinion to explain how the offending juror survives disqualification from all deliberations. Without that juror, no verdict would have had the minimally required ten votes.

The appellants provide substantial authority in support of Wisconsin's steady allegiance to the five-sixths verdict requirement. See *Christensen v. Schwartz*, 198 Wis. 222, 223 N.W. 839 (1929); *Biersach v. Wechselberg*, 206 Wis. 113, 238 N.W. 905 (1931); *Scipior v. Shea,* 252 Wis. 185, 31 N.W.2d 199 (1948);

Sec. 805.09(2), Stats. Further, *State v. Barthels*, 166 Wis. 2d 876, 893, 480 N.W.2d 814, 821 (Ct. App. 1992), *aff'd on other grounds*, 174 Wis. 2d 173, 495 N.W.2d 341 (1993), rejected the proposition "that the *entire jury* must be exposed to such information before the verdict may be impeached." Prejudicial information "brought to bear upon any *juror*" would be sufficient. *See* sec. 906.06(2), Stats. Even when that conclusion, coming from a criminal case requiring a unanimous jury, would be qualified for a civil case like this one, at most it would require exposure of three jurors (or one or two majority jurors in addition to two or one dissenting jurors). Here, because there were two dissenting jurors, the exposure of the additional, offending juror destroyed the integrity of all the verdicts.

The juror's research located the "Report of the Task Force on Medical Liability and Malpractice" that, among other things, included sections on physicians' duty, standard of care, proximate cause, and damages. As the majority points out, the record does not delineate the exact extent to which the juror read, understood, remembered, or utilized each section. That uncertainty is all the more reason for concern. The question is not whether the evidence confirmed that she was improperly influenced. The question is whether the evidence is clear and convincing that she was probably prejudiced because, after all, such information going to a hypothetical juror would probably have produced prejudice. Given "the nature of the matter," *see After Hour Welding*, 108 Wis. 2d at 741, 324 N.W.2d at 691, I conclude it probably would have prejudiced the hypothetical, average juror.

Further, if indeed, as the majority would suggest, we indulge additional speculation based on the specific facts and circumstances of this case, I find the rationale

for a new trial even more resounding. Here, we are not dealing with extraneous information coming to a juror through mere mistake or inadvertence. Here, the information did not arrive at some unknown juncture in the trial, without apparent focus on any issue. Here, instead, the juror, in violation of explicit court orders, initiated the research during closing arguments. Unless we illogically assume that she did so in random fashion, she focused her research on issues where she believed she needed further guidance.

Therefore, I do not agree that more evidence would be needed to establish, in a clear and convincing manner, that the offending juror was prejudiced on all verdicts. Even if the other eleven jurors were untouched by the research, no verdict received more than nine votes from jurors who based their decisions on the evidence, and the evidence alone.

## IV. Conclusion

In this case a juror, during a break in closing arguments, accomplished independent, library research on "the range of jury awards in medical-malpractice cases." See majority op. at 462. She had that information throughout her deliberations on all verdicts, and she shared her research notes with other jurors prior to their consideration of the last verdict on damages. The information would not have been allowed in evidence or argument, and was directly related to "a central issue throughout the trial." *See State v. Ott*, 111 Wis. 2d 691, 694, 331 N.W.2d 629, 631 (Ct. App. 1983).

Apparently, the appellants believe the resulting prejudice accrued to their detriment. The majority, acknowledging the prejudice, would affirm, however, because it believes the prejudice accrued to the detriment of the respondents. What theoretically remains

for debate, therefore, is which side suffered more from the prejudice. What legally remains beyond any debate, however, is that "wholly inappropriate" juror conduct undermined the integrity of the verdicts. Accordingly, I respectfully dissent.