STATE of Wisconsin, Plaintiff-Respondent,

v.

William M. MESSELT, Defendant-Appellant.†

Court of Appeals

*No. 91–2060–CR. Submitted on briefs June 4, 1993.—Decided
July 15, 1993.*

(Also reported in 504 N.W.2d 362.)

†Petition to review granted.

For the defendant-appellant the cause was submitted on the brief of *Richard D. Martin,* assistant state public defender, of Milwaukee.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle,* attorney general, with *Sally L. Wellman,* assistant attorney general.

Before Gartzke, P.J., Dykman and Sundby, JJ.

GARTZKE, P.J. Defendant William Messelt appeals from a judgment convicting him of two counts of second-degree sexual assault, one count of burglary while concealing identity, and one count of false imprisonment while concealing identity. [1] The charges arise out of a June 1988 attack upon an elderly woman in Jackson County. Defendant asserts that he was denied a fair and impartial jury because the trial court refused to change venue or to select a jury from another county, and because some jurors knew or learned from extraneous sources that he had been convicted of two other sexual assaults.

We conclude that the court properly exercised its discretion when it refused to change the venue. We conclude that the juror witnesses who had information about his prior crimes were incompetent to testify to that information, and that the testimony of a nonjuror was competent but insufficient to establish that error had occurred. We therefore affirm.

On April 18, 1989, defendant was charged with first-degree sexual assault, armed burglary, false imprisonment, and battery while armed. On July 20, 1990, an amended information was filed charging

---

[1] Section 940.225(2)(a), Stats., sec. 943.10, Stats., sec. 940.30, Stats., and sec. 939.641, Stats. References to criminal statutes are from the 1987–88 edition.

defendant with first- and second-degree sexual assaults, armed burglary, and false imprisonment while armed, with habitual criminality and concealing identity enhancers.[2] Following a trial in July 1990, the jury returned a verdict of guilty on all charges except the dangerous weapons enhancers (thus reducing the first-degree sexual assault to second-degree). Defendant was sentenced to an indeterminate term of fifty-two years. Defendant moved for postconviction relief on the grounds that the trial court should have granted his motion to change venue, and that extraneous, inadmissible prejudicial information concerning him had reached one or more jurors before the verdict. The trial court denied the motion.

## I.

## MOTION TO CHANGE VENUE

To support his motion, defendant asserted that articles published before the trial in *The Melrose Chronicle* and *The Banner Journal*, newspapers circulated in Jackson County, had prejudiced his chance of securing a fair and impartial trial in that county. He claimed that the articles publicized in detail the state's evidence and publicized inadmissible evidence that he had two prior convictions for sexual assault. One of those assaults had occurred in Trempealeau County in 1980 and the other in Winnebago County in 1985.

Defendant sought a pretrial ruling to prevent the state from introducing evidence of his convictions for those assaults and to prevent the jury from learning

---

[2] Section 940.225(1)(b), Stats., sec. 940.225(2)(a), Stats., sec. 943.10, Stats., sec. 940.30, Stats., sec. 939.62, Stats. (habitual criminality), sec. 939.63, Stats. (weapons enhancer), and sec. 939.641, Stats. (concealing identity).

through his parole officer (who was to testify) that defendant had been on parole. The trial court did not formally rule on either request. However, the state offered no evidence regarding the prior crimes, and the court took care to instruct the parole officer simply to refer to himself as a law enforcement officer when he testified.

In April 1990, the trial court heard and denied the motion to change venue. The court said that because the articles were primarily from the *Chronicle*, printed in Melrose, the jurors would be chosen from other areas of the county. No radio or television coverage had been brought to the court's attention. The court found that the articles had not unfairly reported the pretrial proceedings and were not inflammatory. The court was, however, concerned about two matters published in the articles. The first was opinions concerning the acceptance of DNA testing, and the second was defendant's prior convictions. The court ruled that it would excuse for cause any juror having knowledge of those matters. Because the defendant could individually *voir dire* any juror, the court believed a fair and impartial jury could be selected from Jackson County.

A defendant may move for a change of place for a criminal trial on grounds that an impartial jury cannot be had in the county. Section 971.22(1), Stats. If the court determines that there exists in the county where the action is pending such prejudice that a fair trial cannot be had, it must order that the trial be held in any county where an impartial trial can be had. Section 971.22(3), Stats. In lieu of changing the place of trial, the court may select a jury from a second county. Section 971.225(2), Stats.

We review a ruling on a motion to change the place of trial for the erroneous exercise of the court's discretion. *Hoppe v. State*, 74 Wis. 2d 107, 110, 246 N.W.2d 122, 125 (1976). Although our review is deferential to the ruling, we must "make an independent evaluation of the circumstances." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966); *Tucker v. State*, 56 Wis. 2d 728, 733, 202 N.W.2d 897, 899 (1973).

The factors we evaluate have been stated many times:

> The factors which this court is obliged to consider in determining whether a change of venue ought to have been granted because of community prejudice are outlined in *McKissick v. State*, [49 Wis. 2d 537, 545–46, 182 N.W.2d 282, 286 (1971)]:
>
> "The inflammatory nature of the publicity; the degree to which the adverse publicity permeated the area from which the jury panel would be drawn; the timing and specificity of the publicity; the degree of care exercised, and the amount of difficulty encountered, in selecting the jury; the extent to which the jurors were familiar with the publicity; and the defendant's utilization of the challenges, both peremptory and for cause, available to him on *voir dire*. In addition, the courts have also considered the participation of the state in the adverse publicity as relevant, as well as the severity of the offense charged and the nature of the verdict returned."

*Hoppe*, 74 Wis. 2d at 110, 246 N.W.2d at 125.

We evaluate those factors to "determine whether there was a reasonable likelihood of community prejudice prior to, and at the time of, trial and whether the procedures for drawing the jury evidenced any

327

prejudice on the part of the prospective or impaneled jurors." *Hoppe*, 74 Wis. 2d at 111, 246 N.W.2d at 125–26. Consequently, our evaluation requires both an examination of the evidence supporting the motion to change venue and the jury impaneling process.

## A. Nature of Pretrial Publicity

On June 22, 1988, the *Chronicle* reported the June 15 assaults and said they had "caused quite a stir and angered the residents of this area." On the same day, the *Journal* reported that law enforcement authorities were investigating. On June 29, 1988, the *Chronicle* reported that no arrest had been made.

On April 17, 1989, while he was in prison following his parole violation, a criminal complaint issued, charging defendant with the June 1988 assaults. Two days later the *Chronicle* reported the contents of the complaint. Among other things, the article described the victim's statement that a masked man had tied her up, threatened to kill her and assaulted her. It described how her residence had been entered, interviews with persons who had seen a vehicle like defendant's in the area and a search of defendant's workplace which produced twine similar to that used to tie the victim. Additionally, it described reports from a testing laboratory that the DNA banding patterns obtained from body fluids on the victim's nightgown and defendant's blood samples were the same and that "the frequency of this band pattern in the Caucasian population is 1 in 329 million," and that DNA testing generally is accepted as reliable and accurate. It also stated that in 1985 defendant had been convicted of sexual assault in Winnebago County.

A *Chronicle* article headlined "Rapist Should Be Behind Bars For A Long Time," stated that defendant

was still imprisoned for a parole violation and would be returned to Jackson County to stand trial.[3] On May 3, 1989, the *Journal* reported defendant's arrest, briefly described the 1988 assaults, described his sentence for the prior Winnebago County assault, stated that he had also been convicted for a July 1980 sexual assault in Trempealeau County, and reported that he was incarcerated because his parole had been revoked.

A lull in pretrial publicity followed until late November 1989. On November 22, 1989, the *Journal* reported that defendant, "presently serving time at the Waupun State Prison for parole violation," had been returned to Jackson County for hearings. The article briefly described the assault and stated that the prosecutor asked that the preliminary examination be rescheduled to accommodate a DNA expert who would testify that sperm samples found at the scene of the sexual assault were from defendant and that the DNA test "is reported to be almost 100% accurate." On November 29, 1989, the *Chronicle* reported defendant's preliminary hearing held on November 27. The article detailed the testimony of ten persons, including the victim, and stated that defendant had been convicted of two other unrelated sexual offenses. It stated that the hearing had been adjourned to allow an expert to testify on the basis of an "almost one hundred percent accurate" test that defendant's sperm was found at the scene. On November 29, 1989, the *Journal* briefly reported that the preliminary had been held, and that defendant had served a sentence for a similar charge, had been paroled in 1988, and had been returned to prison for a parole violation.

---

[3] Defendant provided no date for this article.

On December 6, 1989, the *Chronicle* published excerpts from four letters to the editor complaining that the detailed "lurid" reporting, especially that of the victim's testimony at the preliminary, had been unnecessary. On December 16, the editor cf the *Chronicle* published an apology to the victim and the newspaper's readers for having published the "graphic details."[4]

Finally, defendant submitted an article to the trial court, apparently published by the *Chronicle* on January 10, 1990. The article said that he had been bound over for trial, that he had moved to change venue, that reference had been made to tests showing that "sperm samples found at the scene of the sexual assault definitely belong to Messelt," and that he had been on parole for 1980 and 1985 sexual assault charges.

The record contains no other evidence of pretrial publicity occurring before the jury was selected.

The newspaper articles were not inflammatory. The "graphic detail" published in the *Chronicle* was taken from the criminal complaint and the preliminary examination and was accurate. It does not show an intent to inflame or arouse community feeling against the defendant. The letters to the *Chronicle's* editor reflected disgust with that newspaper rather than prejudice against defendant. The gaps between the two clusters of articles — the spring of 1989 and the following November-January — and the trial in July 1990 is such that the memories and passions of readers had time to fade, as proved largely to be the case when the jury was selected.

---

[4] On December 13, 1989, the *Chronicle* reported an accident investigated by an officer who had testified at defendant's preliminary hearing.

We conclude, as did the trial court, that notwithstanding the newspaper coverage, when the motion to change venue was heard in April 1990, a fair and impartial jury could be selected in Jackson County.

B. Jury Selection

The trial court experienced no difficulty in selecting a jury. The process took only one day, July 17, 1990. We assume the court chose Jackson County jurors from areas other than Melrose, the home of the *Chronicle*, because defendant does not contend otherwise. The court excused ten jurors for cause because they personally knew the defendant, his family, or the victim and believed that their personal relationships would influence them. Jurors having a slight acquaintance of that nature were not excused if they believed they could render an impartial verdict.

The court questioned every prospective juror regarding what each had read about the case. The court elicited from most of the jurors who had heard or read about the case their assurances that they could reach an impartial verdict based on the evidence and the instructions and that they had no opinions regarding defendant's guilt or innocence. The court excused for cause two jurors who could not set aside what they had read. Defendant's counsel conducted individual *voir dire* of the jurors regarding what they remembered from what they had read. As a result of that *voir dire*, the court excused for cause three jurors.

Although the court did not limit the individual *voir dires*, defendant's counsel skirted the question of defendant's prior record. The closest counsel came to asking jurors whether they had read or heard anything about defendant's criminal record was to inquire

whether they remembered anything about defendant or learned anything from the articles they had not previously known about him.

We conclude that the trial court exercised considerable care to weed out potentially partial or biased jurors and encountered no difficulty in the jury selection process.

## C. Extent of Jurors' Familiarity with Publicity

The selection process showed that most of the prosecutive jurors knew little about the pretrial publicity and did not know that defendant had a criminal record. In Part II, dealing with defendant's motion to impeach the verdict, we discuss two jurors and perhaps three jurors who had heard about the case, had knowledge of defendant's prior record, and yet were not struck in the selection process. We understand why the court and counsel did not directly question prospective jurors regarding their knowledge of defendant's prior record. The fact is, however, that the general and oblique questions regarding what the jurors knew about him failed to reveal this knowledge.

## D. Defendant's Challenges

The trial court excused all jurors who had formed an opinion and could not set aside what they knew about the case or who had personal feelings that would prevent them from reaching a fair and impartial verdict. Consequently, defendant's counsel had no need to, and did not move to, strike jurors for cause on the grounds that they had been affected by pretrial publicity. The publicity about DNA testing received little attention during the selection process, notwithstanding the trial court's concern about that matter when it

decided the motion to change venue. Defendant used only one peremptory strike to remove a juror who was familiar with DNA testing and whom the court had refused to strike for cause.

E. State's Participation in Adverse Publicity

Defendant does not claim that the state circulated adverse publicity about the case before the trial.

F. Nature of Verdict Returned

The jury acquitted the defendant on the dangerous weapons enhancers. It is fair to infer from that acquittal that the jury evaluated the evidence presented at the trial and did not simply convict defendant on the basis of prejudice or preconceived notions of guilt.

We conclude from our independent evaluation of the record that defendant made no showing of a reasonable likelihood of community prejudice before and at the time of the trial. We also conclude that the jury selection process failed to evidence prejudice on the part of the jurors. We therefore hold that the trial court properly exercised its discretion when it denied defendant's motion to change the place of trial. *Hoppe*, 74 Wis. 2d at 111, 246 N.W.2d at 125–26.

## II.

### MOTION TO IMPEACH VERDICT

A. Trial Court's Findings and Conclusions

The trial court held a hearing on the defendant's motion to impeach the verdict. The court took testimony from every juror. Four jurors testified to

extraneous information they possessed, had received or had been exposed to.[5] The court received in evidence a statement by a nonjuror regarding a conversation held in the presence of one of the four jurors.

At the conclusion of the testimony, the court found that alternate juror Szymanski learned during the trial that defendant had previously been convicted of a sexual assault[6] but did not communicate that information to any other juror. As an alternate juror, Szymanski did not participate in the jury's deliberations. When Juror Reylea was selected as a juror, she knew that defendant had previously committed a sexual assault, but she did not communicate that information to any other juror. When Juror Young was selected he knew of defendant's misconduct in the school system where Young had been a principal, but Young did not communicate that information to any other juror. During a recess Juror Walsted was confronted with a situation in which nonjurors discussed extraneous information in his presence. According to one of the nonjurors, defendant's criminal record was raised in Walsted's presence, and Walsted's father said that defendant should be castrated. The court made no finding that the extraneous information Walsted received was as the nonjuror described it. The court found that the evidence was not clear as to exactly what had been said in Walsted's presence, but Walsted did not communicate whatever he heard to any other juror. Defendant does not contest any of the court's findings, and we accept them as true.

---

[5] One of the four is an alternate juror.

[6] The jurors were not sequestered. During a recess Szymanski overheard a conversation between his coemployees at his place of employment regarding defendant's criminal record.

On the basis of its findings, the court declared itself satisfied that the jury had considered the evidence fairly and impartially, and that the extraneous information brought to the attention of the four jurors did not prejudice the defendant or contribute to his conviction. The court therefore denied the motion for impeachment.

## B. Analysis

When deciding a motion to impeach a verdict, a trial court must consider (1) whether the evidence was competent, (2) whether the evidence shows an error, that is, substantial grounds sufficient to overturn the verdict, and (3) whether the error was prejudicial. *State v. Poh*, 116 Wis. 2d 510, 515–16, 343 N.W.2d 108, 112 (1984).

Juror testimony produced most of the evidence on defendant's motion to impeach the verdict. Whether a juror is competent to testify regarding impeachment turns on sec. 906.06(2), Stats.:

> Upon an inquiry into the validity of a verdict ... a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may the juror's affidavit or evidence of

any statement by the juror concerning a matter about which the juror would be precluded from testifying be received.

In the case before us, only the first exception, "that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention," is at issue.

The state contends that the testimony of none of the four jurors was competent on the question whether extraneous prejudicial information had been improperly brought to the jury's attention. The state's contention is based on a single proposition: that to be competent, the testimony of a juror must show that the extraneous information was brought to the attention of *all* the jurors.[7] The trial court having found that no juror who had extraneous information communicated it to any other juror, the state contends the testimony of those jurors was incompetent to impeach the verdict.

We rejected the same contention regarding sec. 906.06(2), Stats., in *State v. Barthels*, 166 Wis. 2d 876, 893, 480 N.W.2d 814, 821–22 (Ct. App. 1992). The supreme court subsequently held that what we said regarding sec. 906.06(2) was *dictum* and declined to approve or disapprove it. *State v. Barthels*, 174 Wis. 2d 173, 177 n.2, 495 N.W.2d 341, 343 n.2 (1993). We may withdraw *dictum* in a published decision of the court of appeals, *State v. Lee*, 157 Wis. 2d 126, 130 n.4, 458 N.W.2d 562, 563 n.4 (Ct. App. 1990), and in this case we must. We withdraw from our opinion in *Barthels*,

---

[7] Given our disposition we need not determine the unbriefed issue of whether Jurors Reylea and Young, who knew about defendant's past record when they were selected to serve, had "improperly" acquired that information.

166 Wis. 2d at 893, 480 N.W.2d at 821–22, our entire discussion of sec. 906.06(2).

Because the issue is squarely before us, we now decide whether sec. 906.06(2), Stats., renders incompetent testimony by a juror regarding extraneous prejudicial information that was improperly brought to the attention of less than all twelve jurors who deliberated on the verdict. We conclude that the testimony is not competent.

We base our conclusion on the plain and unambiguous language of the first exception in sec. 906.06(2), Stats.: that a juror may testify that extraneous prejudicial information was improperly brought "to the jury's attention." A jury is the collective body of jurors, usually twelve. Information brought to the attention of less than all the jurors is not brought to the attention of that collective body. It is brought "to the jury's attention" only if all twelve jurors learn of it, by whatever means.

Our reading of the first exception in sec. 906.06(2), Stats., is buttressed by the second exception in the same subsection: whether any outside influence was improperly brought to bear upon any "juror." The difference between the "jury," the collective body of jurors, and a "juror," one member of that body, is too much to be ignored. That the same subsection uses the two words evinces a deliberate choice and intent to describe the collective body of jurors in the first exception.

We ignored the difference between "jury" and "juror" in *Barthels*, 166 Wis. 2d at 893, 480 N.W.2d at 821–22, because we condemned as unreasonable a reading of sec. 906.06(2), Stats., that would prevent a defendant from challenging a verdict error if as many as eleven jurors had been exposed to the extraneous

337

information.[8] Our analysis did not search for a reason why under the first exception in sec. 906.06(2) a juror may testify on whether extraneous prejudicial information was improperly brought to the *entire* jury's attention. The reason, in our view, inheres in the policy behind sec. 906.06(2).

That policy is to protect the deliberations of the jury. The policy is expressed in the Federal Advisory Committee's Notes to Federal Rule of Evidence 606(b). Because sec. 906.06(2), Stats., is almost identical to the federal rule, we may look to federal law for guidance. *Poh,* 116 Wis. 2d at 517–18, 343 N.W.2d at 113. The Federal Advisory Committee's Note to Rule 606(b) states, "The values sought to be promoted by excluding the evidence [in the form of testimony by jurors] include freedom of deliberation . . . ." 59 Wis. 2d at R167. "Under the federal decisions the central focus has been upon insulation of the manner in which the jury reached its verdict, and this protection extends to each of the components of deliberation . . . ." *Id.* at R168. "The policy does not, however, foreclose testimony by jurors as to prejudicial extraneous information or influences injected into or brought to bear upon the deliberative process." *Id.*

All twelve jurors engage in the deliberative process. Less than twelve cannot deliberate. Thus, extraneous information, however acquired by a juror, and not brought to the attention of all twelve jurors, is

---

[8] We also labeled it absurd that if all of the jurors had been exposed to the same information but did not collectively exchange their knowledge, the defendant could not challenge the verdict. In that case, however, the information would have been brought to the attention of every member of the jury and therefore to the jury itself.

338

not covered by the policy protecting the deliberative process.

That is undoubtedly why no federal case has been cited to us where the court has set aside the verdict under Rule 606 when extraneous information was brought to the attention of less than the entire jury. *See Rushen v. Spain*, 464 U.S. 114, 120–21 (1983) (per curiam) (no new trial where juror knew defense witness's murder victim); *United States v. Marques*, 600 F.2d 742, 747 (9th Cir. 1979) (no new trial where juror saw the four defendants charged with conspiracy entering a car together), *cert. denied*, 444 U.S. 1019 (1980); *see also Virgin Islands v. Gereau*, 523 F.2d 140, 148–53 (3rd Cir. 1975) (no new trial where various rumors circulated among jurors), *cert. denied*, 424 U.S. 917 (1976). No federal case cited to us has set aside the verdict under Rule 606 when less than all twelve jurors learned of the information.

Since we conclude that the first exception in sec. 906.06(2), Stats., applies only to extraneous information brought to the attention of all members of the jury, the testimony by alternate juror Szymanski, and Jurors Reylea, Young and Walsted is incompetent to impeach the verdict. Our analysis under *Poh* stops.

Section 906.06(2), Stats., does not render incompetent the testimony by the nonjuror regarding what was said in the presence of Juror Walsted. However, as we have noted, the trial court made no finding as to what in fact had been said in Walsted's presence. The nonjuror's evidence therefore does not meet the second test in *Poh*: that the evidence discloses an error sufficient to overturn the verdict.

339

## III.

## CONCLUSION

Because we conclude that the trial court did not erroneously exercise its discretion in denying the motion to change venue and the motion to impeach the verdict, we must affirm the judgment of conviction.

*By the Court.*—Judgment affirmed.