STATE of Wisconsin, Plaintiff-Respondent,

v.

James A. ALBRECHT, Defendant-Appellant.†

Court of Appeals

*No. 93–3280–CR. Submitted on briefs April 15, 1994.—Decided April 26, 1994.*

(Also reported in 516 N.W.2d 776.)

†Petition to review denied.

For the defendant-appellant the cause was submitted on the briefs of *Robert R. Flatley* of *Will and Flatley* of Green Bay.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Diane M. Nicks*, assistant attorney general.

Before Cane, P.J., LaRocque and Myse, JJ.

MYSE, J. James Albrecht appeals a judgment of conviction for first-degree homicide while using a dangerous weapon, as a party, in violation of §§ 940.01, 939.63(1)(a)2 and 939.05(2), STATS. Albrecht contends that the trial court erred by refusing to suppress incriminating statements he made to an undercover officer and a subsequent confession because they were obtained through outrageous and coercive police conduct. Albrecht also contends that the trial court erred by allowing the State to play to the jury a tape recording of his incriminating statements to the undercover officer because it was obtained without a court order, in violation of §§ 968.29(3) and 968.30(8), STATS. Finally, Albrecht contends that the trial court erred by denying his change of venue motion because pretrial publicity precluded the selection of an impartial jury. We conclude that (1) the statements and confession were not obtained through outrageous police conduct, (2) the tape recording was admissible and (3) the trial court did not erroneously exercise its discretion by denying Albrecht's change of venue motion. We therefore affirm the judgment.

## FACTS

Albrecht was a suspect in the 1985 stabbing death of Michelle Koy, because witnesses had observed him near the crime scene the night of the murder and fire at Koy's apartment. Albrecht was not charged with the murder until March 1992. The arrest resulted from incriminating statements Albrecht made to Ron Jost, an undercover officer involved in a police stolen property sting operation.

Albrecht first contacted Jost in October 1991, when Albrecht sold Jost a graphic equalizer. Sometime after this first contact, Jost learned that Albrecht had been questioned about the Koy murder. After informing Appleton police officers about the contact, Jost read newspaper articles about the murder. Jost kept in contact with Albrecht and with Appleton police officers.

In late February 1992, Jost mentioned to Albrecht the possibility of Albrecht joining Jost's criminal organization. During that conversation, Jost asked Albrecht if Albrecht had ever committed any violent crimes or killed anyone, explaining that the organization needed "muscle" and that a violent background would increase Albrecht's chances of being approved for membership by the organization's higher-ups. Albrecht responded that he had not. Jost then took Albrecht on a two-night trip to Milwaukee, ostensibly to meet the higher-up to gain approval. During the trip, Jost told Albrecht that Jost knew Albrecht had been questioned in the Koy murder. Jost then asked Albrecht if Albrecht had been involved and if the police had any evidence against him, stressing the importance of answering truthfully. Jost explained that Albrecht's honesty about any involvement in the Koy murder was necessary for the organization's protection against possible discovery by police during a further investigation of Albrecht. Each

time Albrecht denied any involvement in the Koy murder.

On March 24, 1992, Detective Patrick Geenen approached Albrecht in the parking lot of Albrecht's residence. Geenen introduced himself as the officer currently assigned to the Koy murder, for which Albrecht was still under investigation. Geenen told Albrecht that advances in DNA testing could lead to hard evidence in the murder. Geenen also informed Albrecht that Albrecht was under investigation for other crimes related to the sting operation. Geenen falsely stated that police had a videotape of Albrecht stealing a semi-tractor. Geenen also told Albrecht that Geenen was interested in information about others involved in receiving stolen property, including Jost. In response to Albrecht's questions and statements, Geenen affirmed that someone charged with all of the crimes Albrecht was under investigation for faced several felony counts and possibly a long prison sentence.

Later that evening, Albrecht met with Jost in Jost's apartment and told Jost about Albrecht's conversation with Geenen. Jost and Albrecht discussed the possibility that Jost's crime organization might help Albrecht leave the state. Jost then asked Albrecht again whether Albrecht was involved in the Koy murder, explaining that the organization needed the information to determine how far away from Appleton it should send Albrecht. After denying involvement several times, Albrecht admitted that he might have been involved, but was subconsciously blocking it out.

On March 27, Albrecht telephoned Jost. During that conversation, Albrecht admitted he had committed the Koy murder. Albrecht explained to Jost how he had disposed of several items he used and the clothes he wore during the murder. Albrecht also told Jost he

had set Koy's apartment on fire to cover up the murder, and later cleaned the knife he used to stab Koy with muriatic acid. Jost and Albrecht originally planned to leave the state several days later, but Jost later called Albrecht and stated they would leave from Jost's apartment at 5 p.m. that evening.

When Albrecht arrived at Jost's apartment, he was arrested and taken to the police station. Geenen told Albrecht that Jost was an undercover officer, and that his telephone conversation had been recorded. Geenen informed Albrecht of his *Miranda* rights, and Albrecht stated he understood them and was willing to make a statement. Albrecht then orally confessed to breaking into Koy's apartment, searching the apartment for money, attacking Koy when she unexpectedly came home, handcuffing her to her bed, repeatedly stabbing her with his knife and setting fire to her apartment to cover up the murder. Albrecht also described how he disposed of the handcuffs and the gloves that he had worn during the break-in and murder, and how he cleaned the knife with muriatic acid to remove evidence of the murder. These explanations matched Albrecht's statements to Jost on the telephone earlier that day.

Albrecht was charged with first-degree homicide while using a dangerous weapon. Albrecht subsequently moved the trial court to suppress his statements to Jost and his subsequent confession. Albrecht contended that the statements and confession were obtained through outrageous and coercive police conduct, rendering them involuntary. The trial court refused to suppress Albrecht's statements and confession. The trial court stated it found nothing outrageous, offensive or improper in Jost's conduct of attempting to extract a confession to the murder from Albrecht, who had become entangled in a sting opera-

tion conducted for an unrelated purpose. The trial court also found that Albrecht's statements and confession were voluntarily made, noting Albrecht's prior experience with police, his ability to take care of himself and the noncoercive cajoling by Jost in an attempt to induce Albrecht to admit the murder.

Albrecht also moved the trial court for a change of venue, citing extensive prejudicial pretrial publicity. After examining newspaper articles and video reports of the murder, the court found the reports neither inflammatory nor prejudicial, but "factual, straightforward, and without any undue emphasis." The court also noted that many of the reports were seven and one-half years old.

During the seven-day trial, Albrecht's counsel placed Jost on the stand and, as part of Jost's testimony, had Jost quote substantially from the transcripts of his recorded conversations with Albrecht, which were admitted into evidence. The State then requested the trial court to allow it to play the tape recording of Jost's telephone conversation with Albrecht to the jury. Albrecht objected, claiming it would be repetitive of Jost's testimony. The trial court overruled Albrecht's objection, and the jury heard the tape. The jury found Albrecht guilty of first-degree homicide while using a dangerous weapon.

Albrecht filed a postconviction motion seeking a new trial, contending that the trial court erred by refusing to suppress his statements to Jost and his confession, admitting the tape recording into evidence and denying his change of venue motion. After a hearing, at which Albrecht testified, the trial court denied Albrecht's motion. The trial court again considered all of the circumstances surrounding Albrecht's statements to Jost and his confession, and found no coercive

or outrageous police conduct. The trial court found that the tape recording, while repetitive, became relevant because of issues concerning inflection and the tone in which the words were said and that Albrecht had opened the door to the playing of the tape by asking Jost to read extensively from the transcript. The trial court also noted that, even if the admission of the tapes was improper because they were obtained in violation of statutes governing electronic surveillance, this admission was not prejudicial because the damaging evidence had already come in through Jost's testimony as elicited by Albrecht. The court also found that the jury selection process was not difficult, that there were still other panel members available after the voir dire was complete and that the selection process produced a fair and impartial jury.

## OUTRAGEOUS GOVERNMENT CONDUCT

Albrecht contends that the trial court erred by refusing to suppress his statements to Jost and his subsequent confession because the statements and confession were obtained as a result of outrageous government conduct that violated his fifth amendment protection against compulsory self-incrimination. Albrecht argues that Jost's persistence in posing as a "confidante" and his repeated questioning about Albrecht's involvement in the Koy murder under the guise of determining Albrecht's suitability as a member of Jost's fictitious criminal organization violated "fundamental fairness" and was "shocking to the universal sense of justice." Albrecht asserts that this conduct warrants reversal of his conviction.

In *State v. Steadman*, 152 Wis. 2d 293, 302, 448 N.W.2d 267, 271 (Ct. App. 1989), we acknowledged that a defense of outrageous governmental conduct

exists where a defendant asserts that the conduct violated a specific constitutional right. The defense has its origin in *United States v. Russell*, 411 U.S. 423, 431-32 (1973), where the Supreme Court stated: "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . ." To successfully assert this defense, the defendant must show that "the prosecution . . . violate[s] fundamental fairness [and is] shocking to the universal sense of justice[ ] mandated by the Due Process Clause of the Fifth Amendment." *State v. Hyndman*, 170 Wis. 2d 198, 208-09, 488 N.W.2d 111, 115 (Ct. App. 1992) (quotation omitted).

In *Steadman*, 152 Wis. 2d at 301, 448 N.W.2d at 271, we stated that outrageous government conduct "may arise where the government itself [is] so enmeshed in the criminal activity that prosecution of the defendant [would be] repugnant to the American criminal justice system." That concern, however, is not present here. Albrecht does not contend that the government was involved in the murder, and he does not fault the government for operating the sting. Rather, Albrecht finds fault in the government's seizing an opportunity, unintentionally brought about by the sting, to draw out through trickery, Albrecht's confession to an unsolved murder. We conclude that this conduct is not "outrageous" conduct as contemplated by the *Russell* Court.

Albrecht cites several cases in which courts reversed convictions based on findings of outrageous government conduct. An examination of these cases demonstrates that the conduct at issue here does not

297

rise to the level of "outrageousness" described in those cases.

In *United States v. Twigg*, 588 F.2d 373, 380 (3d Cir. 1978), the court found "a demonstrable level of outrageousness" in the government's acts of gratuitously providing an indispensable chemical ingredient for making methamphetamine hydrochloride, an isolated farmhouse to use as a laboratory and an agent who knew how to make the drug to garner evidence against Twigg.

In *People v. Auld*, 815 P.2d 956 (Colo. Ct. App. 1991), the court upheld the dismissal of charges against Auld on the basis of outrageous government conduct. In *Auld*, as part of an undercover operation targeting Auld, the prosecutor filed a fictitious complaint against an undercover agent, who made several false statements to the judge at the preliminary hearing. The agent then hired Auld to represent him, and offered to pay Auld a retainer plus "something in trade." Auld stated he would be interested in a gun at "a black market price." After Auld was arrested, the district attorney told him the charges might "go away" if he provided information about a number of suspected drug traffickers, including some present and former clients. The appellate court found that the district attorney's acts in working a fraud upon the trial court, making it an unknowing accomplice to the undercover operation, was outrageous. *Id.* at 959.

Moreover, while, as Albrecht notes, most courts have recognized the existence of the outrageous government conduct defense, our research indicates that the majority of state and federal courts have not often found conduct justifying the application of the defense. Indeed, most of the cases Albrecht cites involve instances of government conduct that, while perhaps

offensive, were found not to be "outrageous." *See, e.g., Luna v. State*, 829 P.2d 69 (Okla. Ct. App. 1992) (use of informant to obtain evidence against defendant was not outrageous conduct in absence of evidence showing coercion, entrapment or other police misconduct); *State v. Agrabante*, 830 P.2d 492 (Haw. 1992) (undercover agent's acts in befriending heroin addict and providing transportation, money and otherwise assisting in maintenance of her addiction did not amount to outrageous conduct, which should be found only in "the rarest and most outrageous of circumstances"); *Mondello v. State*, 843 P.2d 1152 (Wyo. 1992) (tricking and cajoling defendant into buying two ounces of cocaine and selling one when defendant had intended to purchase only one ounce for personal use not outrageous government conduct); *State v. Adams*, 839 S.W.2d 740 (Mo. Ct. App. 1992) (officers' direction of informant to arrange drug transactions while wearing a transmitting device not outrageous conduct).

Similarly, federal courts have been reluctant to apply the outrageous government conduct defense absent extreme circumstances. *See, e.g., United States v. White*, 950 F.2d 426 (7th Cir. 1991) (government obtaining, for use in criminal bankruptcy fraud case, from defendant's bankruptcy attorney documents used in preparing bankruptcy petition was not outrageous conduct); *United States v. Quintana*, 508 F.2d 867 (7th Cir. 1975) (agents assuming roles as mobsters was not outrageous conduct); *United States v. Koller*, 956 F.2d 1408 (7th Cir. 1992) (supplying defendant's drug supplier with cocaine and directing the supplier to suggest a larger transaction than defendant's previous transactions was not outrageous conduct); *United States v. Beverly*, 723 F.2d 11 (3d Cir. 1983) (government paying informant to introduce defendant to undercover agent

"looking for someone to burn a building owned by a friend" not outrageous conduct); *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987) (FBI's "manipulation" of a prostitute into an informant and continued use of her as an informant although she continued to engage in prostitution and heroin use during investigation of defendant was not outrageous conduct).

Here, the tactics Jost used, while deceitful, were not outrageous. Jost did not threaten Albrecht into confessing the murder. Jost merely provided Albrecht with opportunities and appealing reasons to do so. Geenen confronting Albrecht with Geenen's knowledge of Albrecht's involvement in property crimes and Geenen's statements that DNA advances could lead to new evidence against Albrecht in the Koy murder investigation provided additional inducement. We therefore conclude that the police conduct in this case was not outrageous, notwithstanding the fact that Albrecht's incriminating statements and confession were partly the result of police deception. In the battle against crime, the police, within reasonable bounds, may use misrepresentations, tricks and other methods of deception to obtain evidence. *See State v. Fehrenbach*, 118 Wis. 2d 65, 66-67, 347 N.W.2d 379, 380 (Ct. App. 1984). Here, the devices used were within the bounds of acceptable police practice.

## VOLUNTARINESS

Next, Albrecht contends that the same circumstances giving rise to his claim of outrageous government conduct rendered his statements to Jost and his confession involuntary. Albrecht argues that the conduct amounted to psychological coercion.

■

At a suppression hearing, the State has the burden of proving the voluntariness of a statement by a preponderance of the evidence. *State v. Rewolinski*, 159 Wis. 2d 1, 16 n.7, 464 N.W.2d 401, 407 n.7 (1990). When determining voluntariness, courts examine the totality of the circumstances surrounding the statement, weighing the defendant's personal characteristics against the pressures police imposed upon the defendant to induce a response to the questioning. *State v. Clappes*, 136 Wis. 2d 222, 236-37, 401 N.W.2d 759, 766 (1987).

> The relevant personal characteristics of the confessor include his age, his education and intelligence, his physical and emotional condition, and his prior experience with the police. These factors must be balanced against the police pressures and tactics which have been used to induce the admission, such as the length of the interrogation, any delay in arraignment, the general conditions under which the confessions took place, any excessive physical or psychological pressure . . . any inducements, threats, methods or strategies utilized by the police to compel a response, and whether the individual was informed of his right to counsel and right against self-incrimination.

*Id.* (Citation omitted.)

■

Absent improper or coercive police conduct, however, we do not reach this balancing. *State v. Arroyo*, 166 Wis. 2d 74, 80, 479 N.W.2d 549, 551 (Ct. App. 1991). We therefore begin by examining the tactics used to induce the statements and the confession to determine whether they were inherently coercive. *See Clappes*, 136 Wis. 2d at 238-39, 401 N.W.2d at 767.

Jost repeatedly questioned Albrecht concerning his involvement in the Koy murder, urging him to be truthful, so that higher-ups in the fictitious crime organization could determine Albrecht's suitability for membership in the organization. While Albrecht was deceived into believing Jost was a confidante and that the crime organization actually existed, nothing about that deceit is inherently coercive or improper. We need not address the argument that these misrepresentations were designed to elicit a false confession. Albrecht repeatedly denied involvement in the murder despite any inducement to admit involvement to increase his chances of acceptance into the organization. It was not until Albrecht was deceived into believing that the organization might help him flee the state that he admitted involvement in the murder.

While the deceit was designed to induce an admission, Albrecht resisted the inducement until his own apprehension about what Geenen told him led him to turn to Jost for help. Albrecht voluntarily confided in Jost and was free to cease contact with Jost at any time. Albrecht's desire to confide in Jost and to have the assistance of the organization in fleeing the state is largely a self-imposed coercive element that does not destroy the voluntary nature of his admissions to Jost. *See Blaszke v. State*, 69 Wis. 2d 81, 90-91, 230 N.W.2d 133, 138-39 (1975). We agree with the trial court that Jost's conduct, while deceitful, was not coercive or improper such that it rendered Albrecht's statements to him involuntary.

We now examine the circumstances surrounding Albrecht's subsequent confession to Geenen. The trial court noted that Albrecht had previous contact with Geenen. Prior to the confession, Geenen informed Albrecht of his *Miranda* rights, and Albrecht indicated

he understood them. Albrecht was alone with Geenen in the interview room and was not wearing handcuffs. Geenen was unarmed. According to Geenen, Albrecht began his confession "just seconds" after he signed a waiver form. The questioning lasted approximately four hours. Albrecht does not contend that Geenen threatened him in any way, or did anything other than ask simple questions about the murder. Rather, Albrecht's assertions of coercion center on his discovery that he had been duped into making incriminating statements to Jost: "At [the time Geenen began custodial questioning], everything was just going down the tubes . . . and I gave up. . . . They had the confession. I figured I was done for anyway. . . . I knew I was going to prison. I didn't want to go. I figured I'd try to get as [little prison] time as possible." As we previously stated, however, our supreme court held in *Blaszke* that self-imposed coercive elements and the desire to get a lesser penalty do not destroy the voluntary nature of a confession. *Id.* at 90-91, 230 N.W.2d at 138-39. We therefore agree with the trial court that nothing in Geenen's conduct at the time of Albrecht's confession was coercive or improper.[1]

---

[1] Although we need not examine Albrecht's personal characteristics, we note that they weighed heavily against a finding of involuntariness. Albrecht, a 26-year-old, had prior experience with the police and had previously been convicted of armed robbery and sentenced to prison. As the trial court noted, Albrecht "was no babe in the woods. He had the benefits, if one can call it that, of practical experience in the criminal world. I cannot believe that he had any naivete about him, that he was gullible." At the time Albrecht made his incriminating statements to Jost, he admittedly was scared because Geenen had recently told him that police had a videotape of Albrecht committing a different crime and that advances in DNA testing

■
We conclude that the State proved by a preponderance of the evidence that Albrecht's incriminating statements to Jost and his confession to Geenen were not the product of coercive or improper police conduct. We therefore conclude that the trial court properly refused to suppress the statements and confession.

## ADMISSIBILITY OF TAPE RECORDING

Albrecht contends that the tape recording was inadmissible because it was obtained in violation of §§ 968.29(3) and 968.30(8), STATS. Albrecht correctly asserts that under *State v. Smith*, 72 Wis. 2d 711, 242 N.W.2d 184 (1976), while Jost's testimony concerning the telephone conversation is admissible, the tape recording itself is inadmissible because no court order authorized the recording. We conclude, however, that Albrecht opened the door to the tape's admission through his extensive reference to the transcript during his case-in-chief.

Additionally, our supreme court in *Smith*, 72 Wis. 2d at 716, 242 N.W.2d at 187, indicated that the tape recording could be used as "defensive impeachment evidence" in rebuttal. After Albrecht requested Jost to read the transcript during Albrecht's case-in-chief, the tape recording itself became relevant during rebuttal to present the tone in which statements were made and to provide other nuances not readily ascertainable from

could lead to hard evidence against him in the Koy murder. Arguably, Albrecht was apprehensive about whether Jost's organization would help him. However, the record does not reveal, and Albrecht does not assert, that he was emotionally or physically incapacitated. We are persuaded that the trial court correctly assessed Albrecht's personal characteristics as they relate to voluntariness.

a transcript. We therefore conclude that the trial court did not erroneously exercise its discretion by allowing the State to play the tape to the jury.

■

Even were we to conclude that the trial court erred by allowing the State to play the tape to the jury, the error did not prejudice Albrecht. As Albrecht noted in his original objection and as the trial court noted at the postconviction hearing, the content of the tape recording was merely repetitive of evidence that had already been presented to the jury through Albrecht's counsel's own questioning of Jost. The tape recording lasted only fifteen minutes, a fraction of the time Albrecht spent asking Jost to read from the transcript as part of a seven-day trial. Moreover, Albrecht does not contend that the playing of the tape prejudiced him or adversely affected his substantial rights. Because we conclude that the error, if any, in playing the tape for the jury did not prejudice Albrecht, we will not grant a new trial on that ground. *See Vogel v. State*, 96 Wis. 2d 372, 394, 291 N.W.2d 838, 849 (1980).

## CHANGE OF VENUE

Albrecht contends that the trial court erred by denying his change of venue motion and his request that a jury be selected from another county. Albrecht argues that the record demonstrates that the jury was partial. Albrecht asserts that, "In respect to jury selection, the court experienced considerable difficulty." He notes that twenty-two of twenty-eight panel members indicated that they had read newspaper articles or had seen television news reports concerning the case, and that five members were excused because they indicated they could not be impartial. Albrecht also points to the fact that, after a seven-day trial, the jury deliberated

less than two hours before returning a guilty verdict and asserts, "A conviction could be returned with such rapidity only if the jury had preconceived opinions of guilt."

We review the trial court's denial of the change of venue motion under the erroneous exercise of discretion standard. *State v. Messelt*, 178 Wis. 2d 320, 327, 504 N.W.2d 362, 364 (Ct. App. 1993). We must, however, independently evaluate the circumstances "to determine whether there was a reasonable likelihood of community prejudice prior to, and at the time of, trial and whether the procedures for drawing the jury evidenced any prejudice on the part of the prospective or empaneled jurors." *Id.* at 327-28, 504 N.W.2d at 364-65 (citation omitted).

In making our evaluation, we consider the following factors: (1) the inflammatory nature of the publicity; (2) the timing and specificity of the publicity; (3) the degree of care exercised, and the amount of difficulty encountered, in selecting the jury; (4) the extent to which the jurors were familiar with the publicity; (5) the defendant's utilization of peremptory and for cause challenges of jurors; (6) the State's participation in the adverse publicity; (7) the severity of the offense charged; and (8) the nature of the verdict returned. *Id.* at 327, 504 N.W.2d at 364. As the State notes, the circumstances here compare favorably to those in *Messelt*, which this court held did not amount to a reasonable likelihood of community prejudice.

As the trial court noted, the newspaper articles in the record straightforwardly report the circumstances of the murder, the stolen property sting and Albrecht's entanglement in the sting. The articles are not inflam-

matory and do not show an intent to inflame or arouse community feeling against Albrecht. Additionally, the most recent article contained in the record is dated six months prior to Albrecht's trial. The record contains no other evidence of publicity prior to the selection of the jury.

Also, as the trial court noted, the selection process was not difficult and lasted only half a day, with panel members remaining after the jury had been selected. The potential jurors were asked many questions during the voir dire, including whether they had seen or read reports about the case. When questioning the jurors about the publicity, the court asked each juror whether the reports the juror had seen were in the newspaper or on television, whether the juror remembered the factual content of the reports and whether the juror was influenced by the reports. While most of the jurors indicated that they had seen some reports about the case, most also indicated that they felt they could be impartial despite seeing or reading those reports. Those who indicated that they could not be impartial were excused for cause. Thus, Albrecht had no need to move to strike jurors for cause on the grounds that they had been affected by pretrial publicity. Albrecht does not contend that he was required to use peremptory strikes to eliminate such jurors. Nor does Albrecht contend that the State is responsible for the publicity. Albrecht was entitled only to a jury willing to impartially decide the issues based on the evidence despite their exposure, if any, to pretrial publicity.

Contrary to Albrecht's assertion, the fact that the jury deliberated less than two hours before returning a guilty verdict does not compel the conclusion that the jury had preconceived notions of Albrecht's guilt

because of the pretrial publicity. The main issue at trial was whether Albrecht was the person who stabbed Koy to death. As the trial court noted, the jury had before it incriminating statements Albrecht made to Jost and his subsequent confession to police, both of which contained information that only the person who committed the murder would have knowledge of. Essentially, the jury was asked to determine whether it believed Jost and Geenen when they recounted Albrecht's incriminating statements and confession. We conclude that Albrecht made no showing of a reasonable likelihood that the jury selection process failed to produce an impartial jury. We therefore conclude that the trial court did not erroneously exercise its discretion by denying Albrecht's change of venue motion.

*By the Court.*—Judgment affirmed.